Aubrey L. Love, H-26500
CSP-Solano, 15-B-2-L
P.O. Box 4000
Vacaville, CA  95696-4000

**ORIGINAL**

IN PROPER

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| AUBREY L. LOVE | CASE NO. C08 - 4072 PJH |
| Petitioner, | NOTICE OF LODGING/FILING EXHIBITS |
| D.K. SISTO-WARDEN | REQUEST JUDICIAL NOTICE PURSUANT TO FEDERAL RULES OF EVIDENCE, RULE 201 |
| Respondent. | |

Petitioner, Aubrey L. Love herenow submits this
Notice of Lodging/Filing Exhibits, to be used and referred
to as relevant documentary evidence as this case takes its
course through these Federal proceedings.

Petitioner request that this Court takes Judicial
Notice on all exhibits attached to this Notice of Lodging/
Filing Exhibits document, pursuant to Federal Rules of
Evidence, Rule 201.

///

1

Petitioner submits the following attached documents, to be lodged/filed as Exhibits in support of his Federal Petition for Writ of Habeas Corpus, Traverse, etc.

EXHIBIT A - PETITIONER'S PLEA AGREEMENT PROCEEDINGS

EXHIBIT B - PETITIONER'S PAROLE HEARING TRANSCRIPT

EXHIBIT C - CALIFORNIA CODE OF REGULATIONS § 2402(d)(8)

EXHIBIT D - PETITIONER'S REALISTIC PLANS FOR RELEASE

EXHIBIT E - PETITIONER'S MARKETABLE SKILLS FOR RELEASE

EXHIBIT F - PETITIONER'S RECENT PSYCHOLOGICAL EVALUATION

EXHIBIT G - PETITIONER'S SELF-HELP PROGRAMMING

///

///

///

///

///

///

///

///

DATE:    August 18, 2008

RESPECTFULLY SUBMITTED,

Aubrey L. Love/ In Proper

2

Name: Aubrey L. Love   CDC: H-26500
CSP-Solano, Housing: 15-B-2-L
P.O. Box 4000
Vacaville, CA 95696-4000

## UNITED STATES DISTRICT COURT

## **NORTHERN** DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| ) | Case No.: _____ |
| ) | |
| AUBREY L. LOVE          , ) | |
| ) | **PROOF OF SERVICE BY MAIL** |
| Petitioner, ) | |
| ) | |
| v. ) | |
| D.K. SISTO-WARDEN       , ) | |
| ) | |
| Respondent. ) | |
| ) | |
| ) | |

I hereby certify that on _____**August 18,**_____, 20 08, I served a copy of the attached
One original copy of a Notice of Lodging/Filing Exhibits,
Exhibits A thru G attached: ,
by placing a copy in a postage paid envelope addressed to the person(s) hereinafter listed, by
depositing said envelope in the United States Mail at the California State Prison - Solano, in
Vacaville, California.

Parties Served:   **CLERK OF THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**450 GOLDEN GATE AVENUE, Box 36060**

**SAN FRANCISCO, CA  94102**

I declare under penalty of perjury that the foregoing is true and correct.

_____
Signature

# EXHIBIT A

SP

1          IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2              IN AND FOR THE COUNTY OF ALAMEDA

3          BEFORE THE HONORABLE LARRY J. GOODMAN, JUDGE

4                      DEPARTMENT NO. 7

5                        ---oOo---

6

7    THE PEOPLE OF THE STATE OF CALIFORNIA,        NO. 105401

8                          PLAINTIFF,
                                                ENDORSED
9              VS.                                FILED
                                             ALAMEDA COUNTY
10   AUBREY LOVELL LOVE,
                                               OCT 2 9 1992
11                         DEFENDANT.

12   _____/    RONALD G. OVERHOLT, Exec. Off./Clerk
                                                By Miranda Edgerly

13

14

15                COMMITMENT TO STATE PRISON

16              FRIDAY, FEBRUARY 21, 1992

17                                          The foregoing instrument is a
                                            correct copy of the original
18                                             on file in this office

19                                      ATTEST: OCT 2 9 1992

20                                            RONALD G. OVERHOLT
                                        Executive Officer/Clerk of the Superior Court,
21                                       State of California, County of Alameda.
                                        BY _____ DEPUTY

22              A P P E A R A N C E S

23   FOR THE PEOPLE:              ANN DIEM
                                  DEPUTY DISTRICT ATTORNEY
24

25   FOR THE DEFENDANT:           JUDITH BROWNE
                                  ASSISTANT PUBLIC DEFENDER
26

27   REPORTED BY:                 JUDY GALLEGOS, CSR #6260

28

```
 1                        P R O C E E D I N G S

 2              FRIDAY, FEBRUARY 21, 1992 -- A.M. SESSION

 3                             ---oOo---

 4              THE COURT:  AUBREY LOVELL LOVE, 105401.

 5          APPEARANCES, PLEASE.

 6              MS. DIEM:  ANN DIEM FOR THE DISTRICT ATTORNEY'S

 7      OFFICE.

 8              MS. BROWNE:  JUDITH BROWNE OF THE PUBLIC

 9      DEFENDER'S OFFICE APPEARING WITH MR. LOVE.

10              THE COURT:  THE COURT HAS RECEIVED, READ, AND

11      CONSIDERED THE PROBATION REPORT.

12              IS THERE ANY LEGAL CAUSE WHY SENTENCE SHOULD NOT

13      BE PRONOUNCED?

14              MS. BROWNE:  NO.

15              THE COURT:  FORMAL ARRAIGNMENT WAIVED?

16              MS. BROWNE:  YES.

17              THE COURT:  ALL RIGHT.

18              THE DEFENDANT HAVING BEEN CONVICTED BY A PLEA OF

19      NO CONTEST TO A VIOLATION OF SECTION 187 OF THE PENAL CODE,

20      TO WIT, MURDER, IT BEING SET AT MURDER IN THE SECOND

21      DEGREE, IT'S THE JUDGMENT AND SENTENCE OF THIS COURT HE BE

22      IMPRISONED IN STATE PRISON FOR THE TERM PRESCRIBED BY LAW,

23      TO WIT, 15 YEARS TO LIFE.

24              THE DEFENDANT FURTHER HAVING ADMITTED THAT DURING

25      THE COMMISSION OF THAT OFFENSE HE PERSONALLY USED A

26      FIREARM, TO WIT, A HANDGUN, IT'S THE JUDGMENT AND SENTENCE

27      OF THIS COURT HE BE IMPRISONED IN STATE PRISON FOR THE

28      ADDITIONAL TERM OF THREE YEARS.  SAID TERM TO BE IN
```

1    ADDITION TO AND CONSECUTIVE TO THE 15 YEARS TO LIFE.

2              PURSUANT TO 669 OF THE PENAL CODE, THE DEFENDANT

3    IS TO SERVE THE DETERMINATE PORTION OF THE SENTENCE, TO

4    WIT, THE THREE YEAR TERM, BEFORE COMMENCING SERVICE OF THE

5    15 YEARS TO LIFE.

6              HE'S TO PAY A $100 RESTITUTION FINE.

7              HE'S REMANDED INTO THE CUSTODY OF THE ALAMEDA

8    COUNTY SHERIFF FOR DELIVERY TO THE DEPARTMENT OF

9    CORRECTIONS.

10             CREDIT FOR TIME SERVED WAS 651, PLUS 326 FOR 977

11   DAYS.

12             MS. BROWNE:  THANK YOU.

13             MS. DIEM:  YOUR HONOR, BEFORE WE FINISH, I

14   BELIEVE THE MOTHER OF THE VICTIM, MISS CARAWAY, IS HERE AND

15   SHE'S INDICATED SHE WOULD LIKE TO MAKE A BRIEF STATEMENT TO

16   THE COURT.

17             THE COURT:  I WAS TOLD SHE DIDN'T.

18             MS. DIEM:  I KNOW.  SHE JUST INDICATED THAT SHE

19   DID.

20        YOUR HONOR, I'M SORRY.  WE'RE COMPLETED.

21                  (PROCEEDINGS CONCLUDED)

22                     ---O0O---

23

24

25

26

27

28

1   STATE OF CALIFORNIA     )
                            )      SS
2   COUNTY OF ALAMEDA       )

3

4

5

6          I, JUDY L. GALLEGOS, A CERTIFIED SHORTHAND

7   REPORTER, DO HEREBY CERTIFY THAT THE FOREGOING IS A FULL,

8   TRUE AND ACCURATE TRANSCRIPT OF MY SHORTHAND NOTES TAKEN OF

9   THE AFOREMENTIONED PROCEEDINGS AT THE TIME AND PLACE

10  THEREIN INDICATED.

11         IN WITNESS WHEREOF, I HAVE HEREUNTO SET MY

12  HAND THIS 22ND DAY OF OCTOBER, 1992.

13

14          _____
            JUDY GALLEGOS,  CSR #6260
15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT B



SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life    )       CDC Number:  H-26500
Term Parole Consideration    )
Hearing of:                  )
                             )
AUBREY LOVE                  )       **INMATE COPY**
_____)


CALIFORNIA STATE PRISON - SOLANO

VACAVILLE, CALIFORNIA

NOVEMBER 8, 2007

8:49 A.M.


PANEL PRESENT:

SANDRA BRYSON, Presiding Commissioner
ROBERT HARMON, Deputy Commissioner

OTHERS PRESENT:

AUBREY LOVE, Inmate
BEN DAVEY, Attorney for Inmate
JILL KLINGE, Deputy District Attorney
DEANNA CHURCHILL, Victim's sibling
DONNA SPRIGGS, Victim's best friend
G. LEE, Counselor
Correctional Officer, Unidentified


CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____ No     See Review of Hearing
_____ Yes    Transcript Memorandum



P.D. Jones, WPU Inc.

## I N D E X

Page

Proceedings........................................... 3

Case Factors......................................... 16

Pre-Commitment Factors............................... 25

Post-Commitment Factors.............................. 35

Parole Plans......................................... 54

Closing Statements................................... 85

Recess............................................... 107

Decision............................................. 108

Adjournment.......................................... 119

Transcript Certification............................. 120

1           **P R O C E E D I N G S**

2       **DEPUTY COMMISSIONER HARMON:** And you're on record.

3       **PRESIDING COMMISSIONER BRYSON:** And this is the

4   second subsequent parole consideration hearing for

5   Aubrey Love, CDC number H, Henry, 26500. Today's date

6   is November 8th 2007, and the time is 8:49. We're

7   located at California State Prison, Solano. This inmate

8   was received March 2nd 1992 from Alameda County. The

9   life term began May 11th 1992 with a minimum eligible

10  parole date of May 11th 2002. Charging in case number

11  ALA-105401 count 1, the controlling offense Penal Code

12  187, murder second; with Penal Code 12,022.5a, use of a

13  firearm for which the inmate received a term of 15 plus

14  3 or 18 years to life.

15       This hearing is being recorded. For the purpose of

16  voice identification, each of us will state our first

17  and last names, spelling the last name. When it is your

18  turn sir, after you spell your last name, please state

19  your CDC number. I will start and go to my left.

20  Sandra Bryson, B-R-Y-S-O-N, Commissioner, Board of

21  Parole Hearings.

22       **DEPUTY COMMISSIONER HARMON:** I'm Robert Harmon, H-

23  A-R-M-O-N, Deputy Commissioner.

24       **INMATE LOVE:** Love, L-O-V-E, Aubrey.

25       **ATTORNEY DAVEY:** CDC.

4

1        **INMATE LOVE:**  H-26500.

2        **ATTORNEY DAVEY:**  Ben Davey, D-A-V-E-Y, Attorney for

3    Mr. Love.

4        **DEPUTY DISTRICT ATTORNEY KLINGE:**  Jill Klinge, K-L-

5    I-N-G-E, Deputy District Attorney, Alameda County.

6        **COUNSELOR LEE:**  Counselor G. Lee, L-E-E.

7        **DEANNA CHURCHILL:**  I'm Deanna Churchill, the

8    victim's sister.  D-E-A-N-N-A.  Last name is C-H-U-R-C-

9    H-I-L-L.

10       **PRESIDING COMMISSIONER BRYSON:**  Thank you.

11       **DONNA SPRIGGS:**  I'm Donna Spriggs, Patty's best

12   friend.  Donna, D-O-N-N-A, S-P-R-I-G-G-S.

13       **PRESIDING COMMISSIONER BRYSON:**  Thank you.  Yes?

14       **CORRECTIONAL OFFICER:**  Recess?

15       **PRESIDING COMMISSIONER BRYSON:**  Yes, officer.

16   We're gonna take a short recess.  The time is now 8:50.

17                          **RECESS**

18                (Recording appears to continue)

19                          --o0o--

20       **PRESIDING COMMISSIONER BRYSON:**  Sir, Would you

21   please raise your right--Oh, we're back on record?

22       **DEPUTY COMMISSIONER HARMON:**  We're back on record.

23       **PRESIDING COMMISSIONER BRYSON:**  The time is 9:52.

24   Would you please raise your right hand so I can swear

25   you in?  Do you solemnly swear or affirm that the

*WPU, Inc.*

 1  testimony you give at this hearing will be the truth,

 2  the whole truth and nothing but the truth?

 3      **INMATE LOVE:**  I do.

 4      **PRESIDING COMMISSIONER BRYSON:**  Commissioner

 5  Harmon, is there any confidential material in the file

 6  and, if so, will it be used today?

 7      **DEPUTY COMMISSIONER HARMON:**  There is confidential

 8  information in the file.  None of it will be utilized in

 9  today's hearing.

10      **PRESIDING COMMISSIONER BRYSON:**  Thank you, and I've

11  passed the hearing checklist marked Exhibit 1, sir, to

12  your attorney and also to the district attorney to

13  ensure that we're all proceeding with the same set of

14  documents.  And I'll ask the district attorney, do you

15  have all the documents?

16      **DEPUTY DISTRICT ATTORNEY KLINGE:**  I do, thank you.

17  I would note that I received the psychological report

18  this week.

19      **PRESIDING COMMISSIONER BRYSON:**  And counsel, do you

20  have all the documents?

21      **ATTORNEY DAVEY:**  Yes ma'am.  I acknowledge receipt

22  of a, what I would consider a late psychological

23  evaluation on 11/5/07; however, in discussing with my

24  client, the issues relating to waiving the ten day rule

25  on submitted documents, he's willing to waive that rule

1  and proceed today without any objection.

2      **PRESIDING COMMISSIONER BRYSON:**  All right, thank

3  you.  Are there additional documents to be submitted

4  counsel?

5      **ATTORNEY DAVEY:**  I have none at this point,

6  Commissioner.

7      **PRESIDING COMMISSIONER BRYSON:**  Okay.  Sir, would

8  you please read the ADA statement in front of you aloud?

9      **INMATE LOVE:**  "The Americans with Disabilities

10      Act, ADA, is a law to help people with

11      disabilities.  Disabilities are problems that

12      make it harder for some people to see, hear,

13      breathe, talk, walk, learn, think, work, or take

14      care of themselves than it is for others.

15      Nobody can be kept out of public places or

16      activities because of a disability.

17          If you have a disability, you have the

18      right to ask for help to get ready for your

19      board parole hearing, get to the hearing, talk,

20      read forms and papers, and understand the

21      hearing process.  The Board of Parole Hearing

22      will look at what you have asked for to make

23      sure that you have a disability that is covered

24      by the ADA and that you have asked for the right

25      kind of help.  If you do not get help, or if you

1      don't think you got the kind of help you need,

2      ask for it, the Board of Parole Hearing

3      grievance form.  You can also get help to fill

4      it out."

5      **PRESIDING COMMISSIONER BRYSON:**  Thank you sir.  Do

6  you understand what you read?

7      **INMATE LOVE:**  Yes.

8      **PRESIDING COMMISSIONER BRYSON:**  All right.  Sir, I

9  noticed that on April 18th 2007 you signed BPT form

10  1073, the Reasonable Accommodation Notice and Request in

11  accordance with the provisions the Americans With

12  Disabilities Act, as defined under the ADA.  Is that

13  information still current and correct as far as you

14  know?

15      **INMATE LOVE:**  Yes, ma'am.

16      **PRESIDING COMMISSIONER BRYSON:**  And this shows that

17  you have no disabilities identified from the file

18  review.  I do note that you wear glasses.  Do they

19  accommodate you for seeing?

20      **INMATE LOVE:**  Yes.

21      **PRESIDING COMMISSIONER BRYSON:**  Do have any

22  difficulty walking up or down stairs sir?

23      **INMATE LOVE:**  No.

24      **PRESIDING COMMISSIONER BRYSON:**  And I note that you

25  don't appear to have any hearing difficulties.  Is that

1    correct?

2       **INMATE LOVE:**  Yes ma'am.

3       **PRESIDING COMMISSIONER BRYSON:**  And you didn't

4    appear to have any mobility issues.  Is that correct

5    also?

6       **INMATE LOVE:**  True.

7       **PRESIDING COMMISSIONER BRYSON:**  All right.  Have

8    you ever been included in the CCCMS or EOP Programs?

9       **INMATE LOVE:**  No ma'am.

10      **PRESIDING COMMISSIONER BRYSON:**  Have you ever taken

11   psychotropic medication, either in prison or on the

12   streets?

13      **INMATE LOVE:**  No.

14      **PRESIDING COMMISSIONER BRYSON:**  All right.  I note

15   you do have your GED.

16      **INMATE LOVE:**  Yes.

17      **PRESIDING COMMISSIONER BRYSON:**  And we noticed a

18   chrono in the file dated 1994.  A medical chrono that

19   showed that you had some sort of medical condition at

20   that time.  Do you remember that?  And we were wondering

21   what that was, it was a very serious medical chrono it

22   appeared.

23      **INMATE LOVE:**  Wasn't really serious.  It's just

24   (indiscernible) seizures.

25      **PRESIDING COMMISSIONER BRYSON:**  All right.  Have

1   you been prone to seizures in your past, and are you

2   now, is the question?

3       **INMATE LOVE:**  Yes.

4       **PRESIDING COMMISSIONER BRYSON:**  Are you taking -

5   medication --

6       **INMATE LOVE:**  Yes.

7       **PRESIDING COMMISSIONER BRYSON:**  -- for seizures?

8       **INMATE LOVE:**  Yes.

9       **PRESIDING COMMISSIONER BRYSON:**  And do they

10  apparently work for you?

11      **INMATE LOVE:**  Yes.

12      **PRESIDING COMMISSIONER BRYSON:**  What frequency do

13  you have seizures?

14      **INMATE LOVE:**  I have a light one probably one a

15  year.

16      **PRESIDING COMMISSIONER BRYSON:**  Once.  Okay.  Not a

17  very --

18      **INMATE LOVE:**  No.

19      **PRESIDING COMMISSIONER BRYSON:**  -- frequent --

20      **INMATE LOVE:**  No, I don't have no Grand mals or

21  nothing like that.

22      **PRESIDING COMMISSIONER BRYSON:**  Oh, that's

23  excellent.  All right, good.  Do you suffer from any

24  disability you think might prohibit you from

25  participating in today's hearing?

1    **INMATE LOVE:**  No ma'am.

2    **PRESIDING COMMISSIONER BRYSON:**  Thank you.  And

3  counsel, do you concur?

4    **ATTORNEY DAVEY:**  I would concur, Commissioner.

5    **PRESIDING COMMISSIONER BRYSON:**  Thank you.  This

6  hearing is being conducted pursuant to Penal Code

7  Sections 3041 and 3042, and the rules and regulations of

8  the Board of Parole Hearings governing parole

9  consideration hearings for life inmates.  The purpose of

10  today's hearing is to consider your suitability for

11  parole.  In doing so, the panel will consider the number

12  and nature of crimes for which you were committed, your

13  prior criminal and social history, and your behavior and

14  programming since your commitment.

15    The panel has had the opportunity to review your

16  central file.  You'll be given the opportunity to

17  correct or clarify the record.  The panel will consider

18  your progress since your commitment, your counselor's

19  report, psychological report and any other relevant

20  information.  Any change in parole plans should be

21  brought to the panel's attention.

22    The panel will reach a decision today and inform

23  you whether or not it finds you suitable for parole and

24  the reasons for its decision.  If you're found suitable

25  for parole, the length of your confinement will be

1   explained to you.

2       Nothing that happens here today will change the

3   findings of the court.  The panel is not here to retry

4   your case.  The panel is here for the sole purpose of

5   determining your suitability for parole.  Do you

6   understand?

7       **INMATE LOVE:**  Yes.

8       **PRESIDING COMMISSIONER BRYSON:**  This hearing will

9   be conducted in three phases.  I will discuss with you

10  the crime for which you were committed, your prior

11  criminal and social history.  Commissioner Harmon will

12  discuss with you your progress since your commitment,

13  your counselor's report and your psychological

14  evaluation.  I will then discuss with you your parole

15  plans and any letters of support or opposition that may

16  be in the file.

17      Once that is concluded, the panel and then the

18  district attorney, and then your attorney will be given

19  the opportunity ask you questions.  Questions from the

20  district attorney shall be asked through the Chair, and

21  you'll direct your answers to the panel.  Next, the

22  district attorney, then your attorney, then you will be

23  given an opportunity to make a final statement regarding

24  your parole suitability.

25      Your statement should address why you feel you are

1  suitable for parole.  Then the victim's next of kin will

2  have the opportunity to give statements regarding the

3  crime and your responsibility.  The panel will then

4  recess, clear the room and deliberate.  Once the

5  deliberations are completed, the panel will resume the

6  hearing and announce the decision.

7      The California Code of Regulations states that

8  regardless of time served, a life inmate shall be found

9  unsuitable for and denied parole if, in the judgment of

10 the panel, the inmate would pose an unreasonable risk of

11 danger to society if released from prison.

12     You have certain rights.  Those rights include the

13 right to a timely notice of this hearing.  Were you

14 given timely notice of this hearing, sir?

15     **INMATE LOVE:**  Yes.

16     **PRESIDING COMMISSIONER BRYSON:**  All right.  You

17 have the right to review your central file.  Sir, I note

18 that on April 13th 2007 you were given the opportunity

19 to review your central file and you declined. Is that

20 correct?

21     **INMATE LOVE:**  Yes.

22     **PRESIDING COMMISSIONER BRYSON:**  Why is that sir?

23     **INMATE LOVE:**  'Cause I'd been through it before,

24 and there shouldn't of been anything in there that

25 wasn't in there before.

1   **PRESIDING COMMISSIONER BRYSON:**   I understand.

2   Just, this is the speech I give all inmates.  And,

3   basically, the Olsen review is all about you, --

4       **INMATE LOVE:**   Yes.

5       **PRESIDING COMMISSIONER BRYSON:**   -- and I do

6   recommend that you do it, because your whole life now is

7   in this cardboard packets, and things can fall out, get

8   lost.  And you may have things that, once it jogs your

9   mind, you need to put copies of in the central file.

10  And you're the only that can do that.  Also, we may find

11  errors today in the board report, etc.  Again, you're

12  the only one that can make those changes.

13      **ATTORNEY DAVEY:**  Commissioner, one moment please.

14  (Indiscernible).

15      **INMATE LOVE (TO ATTORNEY DAVEY):**  Yeah.  Right,

16  because I put it, I was in there talking with him, and I

17  put it in there.

18      **ATTORNEY DAVEY:**  Commissioner I did, in my review

19  of the C file, found a chrono that he did review the C

20  file on 4/18 not 4/13.  I don't know if that's --

21      **PRESIDING COMMISSIONER BRYSON:**  He did review it on

22  the 18th?

23      **ATTORNEY DAVEY:**  Yeah, with his counselor.

24      **PRESIDING COMMISSIONER BRYSON:**  All right.  Well

25  then good for you.  I needn't have given you that

1   speech, sir, but our document, you confirmed with me

2   that you didn't, so I went ahead with it.  Well, that --

3        **ATTORNEY DAVEY:**  Not on that day.

4        **PRESIDING COMMISSIONER BRYSON:**  -- was a wise

5   decision.  All right.

6        **INMATE LOVE:**  It was a later date.

7        **PRESIDING COMMISSIONER BRYSON:**  Understood.  Okay.

8   Well, that's good.  Yeah, it was a wise decision.  You

9   also, sir, have the right to present relevant documents

10  which you're doing here today.  You also have the right

11  to be heard by a impartial panel.  Do you have any

12  evidence that the panel before you cannot be impartial?

13       **INMATE LOVE:**  No ma'am.

14       **PRESIDING COMMISSIONER BRYSON:**  Okay.  You will

15  receive a copy of the panel's written tentative decision

16  today.  That decision will become effective within 120

17  days.  It is also subject to review by the governor.  A

18  copy of that decision, and a copy of the transcript,

19  will be sent to you.  The board has eliminated its

20  appeals process.  If you disagree with anything in

21  today's hearing, you have the right to go directly to

22  the court with your complaint.

23       You're not required to admit your offense or

24  discuss your offense, if you do not wish to do so.

25  However, this panel does accept as true the findings of

1   the court, and you're invited to discuss the facts and

2   circumstances of the offense if you desire.  The board

3   will review and consider any prior statements you've

4   made regarding the offense in determining your

5   suitability for parole.  So basically, it's very simple

6   sir, just tell the truth.

7       **INMATE LOVE:**  Sure.

8       **PRESIDING COMMISSIONER BRYSON:**  Counsel, are there

9   any preliminary objections?

10      **ATTORNEY DAVEY:**  Not at this point, Commissioner.

11  There may be as we move through the hearing, so I'll

12  reserve those for the appropriate time.

13      **PRESIDING COMMISSIONER BRYSON:**  All right.  Will

14  this inmate be speaking with the panel today?

15      **ATTORNEY DAVEY:**  My client will discuss peripheral

16  issues relating to suitability, including all the parole

17  plans, the past criminality, the post-conviction, social

18  factors, but he will not be discussing the life crime

19  today.  My client doesn't fully admit the murder in this

20  case.  He takes full responsibility for his actions.  He

21  --

22      **DEPUTY DISTRICT ATTORNEY KLINGE:**  You know I just

23  have to object at this point.  If he's gonna discuss it,

24  he's gonna discuss it; but his attorney can't really

25  speak for him whether he fully admits or takes

1   responsibility.

2       **PRESIDING COMMISSIONER BRYSON:** And that is true.

3       **DEPUTY COMMISSIONER HARMON:** All hearsay.

4       **PRESIDING COMMISSIONER BRYSON:** So we will--

5       **ATTORNEY DAVEY:** We'll stand on the findings and

6   orders of the court.

7       **PRESIDING COMMISSIONER BRYSON:** All right.

8       **ATTORNEY DAVEY:** And I have a right to make a

9   statement in that regard, notwithstanding the objection.

10      **PRESIDING COMMISSIONER BRYSON:** Any you have –

11      **ATTORNEY DAVEY:** Thank you.

12      **PRESIDING COMMISSIONER BRYSON:** -- the, okay. The

13  question on this panel has is that there, is the

14  prisoner's version in our board report?

15      **ATTORNEY DAVEY:** We'd requested that be

16  incorporated by reference as his version of the crime.

17      **PRESIDING COMMISSIONER BRYSON:** As his version of

18  the crime. All right. I will, therefore, read into

19  the record the offense summary as it's presented in the

20  most recent board report we have which is dated

21  September 18th 2007, beginning on page 1. I should note

22  that source documents are the probation officer's

23  report that is typed on February 13th of 1992, pages 1

24  through 14.

25          "On May 8th 1990, the police were called to

1    the victim's (Patricia Churchill) house.  When

2    the police arrived, Patricia Churchill was

3    bleeding from the back of her head from a

4    gunshot wound.  None of the neighbor's heard

5    anything, but they all identified Aubrey Love,

6    the prisoner, as the victim's husband.

7    Witnesses reported the victim and Love fought

8    often.

9    When the victim was taken to the hospital,

10    it was determined she was sixteen to twenty

11    weeks pregnant.  The victim was placed on life

12    support in an attempt to save the life of the

13    fetus.  Patricia Churchill, the victim, was

14    finally taken off life support after it was

15    determined the fetus was not viable.

16    During the investigation it was discovered

17    that on November 11th 1989, the victim filed a

18    domestic violence dispute against Love.  Once

19    witness stated it was filed after cousins of

20    victim beat Love.  Another witness stated the

21    victim informed her that the victim was planning

22    to leave Love and did not want him to know.

23    This same witness had seen Love

24    approximately three weeks before the murder, and

25    Love had asked about the victim.  He stated

1     'Revenge is sweet'. The witness also stated she

2     heard sounds of fighting earlier in the evening

3     of the victim's death.

4         When Love was first interviewed, he

5     admitted living with the victim on a sporadic

6     basis after meeting her at Herzog," H-E-R-Z-O-G,

7     "an inpatient drug rehabilitation program. He

8     admitted that he had a .32 caliber handgun, but

9     it was only an antique handgun. He claimed he

10    was home all day on the day of the shooting and

11    was not drinking. He also claimed he did not

12    know the victim was pregnant.

13        He reported his relation with her ended

14    when he had an argument with the victim and when

15    her cousins had beat him. He claims he assured

16    the victim he would not press charges against

17    her or her cousins in spite of the fact that he

18    was hospitalized. During another interview with

19    Love, a request was made for the truth.

20        Love's response was, 'Request for the

21    truth? Okay, I'll confess. She told me to come

22    over and get the rest of my stuff. I called her

23    about 9 p.m. She asked me to come and get the

24    rest of my things. I asked, 'Is this another

25    game?' She said, 'No, just come over and get

1   the rest of your shit'. I took my .32. I went

2   up the back steps. The door was open. She

3   threw my shirt and underwear at me. She spit at

4   me and tried to kick me. I fired once or twice

5   and then left. I slipped down the stairs. I

6   got up and started walking, and she was still

7   hollering. I had been drinking quite a bit that

8   day. I went by bus to her house and went back

9   to my house by bus. I threw two shells away and

10  put two live shells in the gun'.

11  As to prisoner's version in the aforementioned

12  board report, which I believe I did not indicate but,

13  was prepared by P. Dupass, D-U-P-A-S-S, Correctional

14  Counselor I. As to prisoner's version, on page 2,

15      "Love was interviewed on June 18th 2001.

16  Love produced this statement.

17      'On May 8th 1990, about 9:30 or 10 p.m., I

18  was asked by Pat over the phone to come and get

19  the remaining things that she forgot to give me

20  earlier. As we talked, I asked her if there

21  would be any problems. Her answer was 'No'. I

22  must admit I'd been drinking a bit, and I truly

23  forgot about the restraining order when I went

24  to her apartment.

25      During the time we lived together I would

1    carry a gun at times. The night of the incident

2    I was not carrying it to do harm to Patricia,

3    because I cared for her even though we were no

4    longer together. As I came up the stairs, and

5    got to the top of the stairs, the door came

6    open. She came out talking crazy. She threw a

7    few a clothes and other items at me. We got

8    into a verbal argument.

9        As I was going back down the stairs, I was

10   pushed, and I stumbled down the stairs. Out of

11   anger, I shot up at the door not knowing that

12   she was peeping out of the door, and she was hit

13   in the forehead with the bullet. When the

14   police picked me up in Berkeley, two days later,

15   they took me to the Oakland Police Department

16   for questioning.

17       At the beginning of the questioning, I

18   started lying, because I didn't believe Patricia

19   was injured. As the interview continued, I

20   realized she's been killed, and she was also

21   pregnant. The whole situation made me very sad,

22   and it all seemed like a dream. In all honesty,

23   this incident was an unintentional accidental

24   shooting. But because of my mistakes, a person

25   is dead as well as my child. I'm truly sorry

*WPU, Inc.*

1    for the victim, her family and my child."

2    And during an interview with Love, on April 13th,

3    2007, he stated his version remains the same.

4    As to this inmate's history, first before I go to

5    that; sir, I'm gonna ask some questions that are

6    peripheral to the actual commitment offense.   And it's

7    up to you and your attorney if you wish to answer these

8    or not.   And the panel would like to know if, in fact,

9    you were under the influence just prior to this

10   offense?   Were you under the influence just prior to

11   this offense sir?

12   **INMATE LOVE:**  Yeah, I'd been drinking.

13   **PRESIDING COMMISSIONER BRYSON:**  Alcohol?   Did you

14   have any drugs on board?

15   **INMATE LOVE:**  No.

16   **PRESIDING COMMISSIONER BRYSON:**  And how long had

17   you had the weapon that was involved sir?

18   **INMATE LOVE:**  Quite some years.

19   **PRESIDING COMMISSIONER BRYSON:**  Quite some years.

20   Were you carrying it legally?

21   **INMATE LOVE:**  No.

22   **PRESIDING COMMISSIONER BRYSON:**  What was the

23   weapon?

24   **INMATE LOVE:**  Pistol.

25   **PRESIDING COMMISSIONER BRYSON:**  Do you remember

1  what kind of pistol?

2       **INMATE LOVE:**  32.

3       **PRESIDING COMMISSIONER BRYSON:**  Was it a revolver?

4       **INMATE LOVE:**  Yes.

5       **PRESIDING COMMISSIONER BRYSON:**  And prior to the

6  crime, was it loaded?

7       **INMATE LOVE:**  Yes.

8       **PRESIDING COMMISSIONER BRYSON:**  Was it your habit

9  to carry this pistol with you?

10      **INMATE LOVE:**  The majority of the time, yes.

11      **PRESIDING COMMISSIONER BRYSON:**  And why is that

12  sir?

13      **INMATE LOVE:**  The environment I stayed in, we

14  stayed in.  The lifestyle, just the environment.  It was

15  a rough living areas.

16      **PRESIDING COMMISSIONER BRYSON:**  So what was your

17  plan in carrying the pistol --

18      **INMATE LOVE:**  Protection.

19      **PRESIDING COMMISSIONER BRYSON:**  Okay.  Had you ever

20  had to use it?

21      **INMATE LOVE:**  No.

22      **PRESIDING COMMISSIONER BRYSON:**  Had you practiced

23  with it?

24      **INMATE LOVE:**  In what fashion are you speaking of?

25      **PRESIDING COMMISSIONER BRYSON:**  Had you practiced

1   firing it?

2      **INMATE LOVE:**  I've shot it before, yes.

3      **PRESIDING COMMISSIONER BRYSON:**  So were you

4   proficient with it?  That's the question.

5      **INMATE LOVE:**  No, I'm not no expert with shooting

6   no gun.

7      **PRESIDING COMMISSIONER BRYSON:**  I didn't say expert

8   sir.  I said were you proficient with the weapon?

9      **INMATE LOVE:**  No.

10     **PRESIDING COMMISSIONER BRYSON:**  Okay.  And then my

11  question is, were you so under the influence that you

12  have difficulty recalling specifics of the offense, or

13  were you pretty clearheaded?

14     **ATTORNEY DAVEY (to INMATE LOVE):**  (Indiscernible)

15  if you know the answer.  If not, don't.

16     **INMATE LOVE:**  I was intoxicated.

17     **PRESIDING COMMISSIONER BRYSON:**  I'm trying to

18  understand what that meant, sir, from a standpoint of

19  your perceptions, your awareness level.  Some people,

20  when they're intoxicated, everything's a blur, some,

21  there are many many ranges of people being intoxicated.

22  Some people remember perfectly.  They function very

23  high level when they're intoxicated, some do not.

24  That's what I'm trying to understand, what your

25  functioning level was.

1    **INMATE LOVE:**   I wasn't functioning at full

2   capacity.

3    **PRESIDING COMMISSIONER BRYSON:**  All right.  Did you

4   drink a lot during that time period prior to the

5   commitment offense?

6    **INMATE LOVE:**  Yes ma'am.

7    **PRESIDING COMMISSIONER BRYSON:**  How much would you

8   say you drank?

9    **INMATE LOVE:**  You speaking of that day or just

10  everyday?

11   **PRESIDING COMMISSIONER BRYSON:**  Everyday.  On

12  average.

13   **INMATE LOVE:**  Two, three, four half of pints.

14   **PRESIDING COMMISSIONER BRYSON:**  Half pints of what?

15   **INMATE LOVE:**  Gin.

16   **PRESIDING COMMISSIONER BRYSON:**  Two, three or four

17  half-pints of gin a day?

18   **INMATE LOVE:**  Yes.  Sociably drinking with friends

19  and what-not throughout the day, yes.

20   **PRESIDING COMMISSIONER BRYSON:**  Okay.  And, to

21  reiterate, did you do drugs at all?  Were they part of

22  your lifestyle?

23   **INMATE LOVE:**  No.

24   **PRESIDING COMMISSIONER BRYSON:**  Okay.  All right,

25  this inmate has, let me ask first, Commissioner Harmon,

1    do you have any questions concerning the timeframe, the

2    ramp-up prior to the crime?

3    **DEPUTY COMMISSIONER HARMON:**  Not at this time.

4    **PRESIDING COMMISSIONER BRYSON:**  All right.  This

5    inmate has no juvenile arrest history.  As to adult

6    convictions and arrest, this inmate was first arrested,

7    that we have in our records, on November 12th 1975 by

8    Oakland Police Department for Penal Code 245, assault

9    with a deadly weapon and was convicted of battery,

10    sentenced to two years probation and $100 fine.

11    Then Oakland Police Department issue him a citation

12    on March 1st 1978 for violation of Vehicle Code 23102,

13    reckless driving.  He was convicted, placed on

14    probation and ordered to attend driving school.  Did

15    you complete that driving school?  Do you remember sir?

16    **INMATE LOVE:**  Yes ma'am.

17    **PRESIDING COMMISSIONER BRYSON:**  Okay.  Berkeley

18    Police Department convicted you of Penal 243, battery

19    on a peace officer arresting you on May 30th 1978, and

20    you were convicted of disturbing the peace and ordered

21    to pay a $15 fine.  Berkeley Police Department arrested

22    you on June 20th 1979 for Penal Code 496, burglary.  You

23    were convicted of burglary, sentenced to 3 years

24    probation and sentenced to 180 days in the county jail.

25    Berkeley Police Department arrested you on January

1   10th 1980 for Vehicle Code 12951a, not being in

2   possession of a valid driver's license. You were

3   convicted, pled guilty. Oakland Police Department

4   issued you a citation on May 13th 1980 for Penal Code

5   496, burglary and Penal Code 484, theft. You were

6   convicted of Penal Code theft, placed on 18 months

7   probation and sentenced to 90 days in the county jail.

8       Berkeley Police Department arrested you on December

9   3rd 1980 for Penal Code 148, resisting arrest. You pled

10  guilty to disturbing the peace, sentenced to one year

11  probation and sentenced to thirty days suspended

12  sentence. Oakland Police Department issued you a cite

13  on November 10th 1980 for Vehicle Code 23102a, reckless

14  driving. You were convicted, placed on a one year

15  probation and ordered to pay a fine.

16      Then you received a DUI, Vehicle Code 23152a from

17  Oakland P.D. on January 4th 1983. You were given three

18  years probation, sentenced to thirty days in the county

19  jail. Berkeley Police Department arrested you on

20  December 7th 1983 for Vehicle Code 146012a, driving with

21  a suspended license. You were convicted, placed on a

22  one year probation, thirty days in jail in order to pay

23  a fine.

24      Berkeley Police Department arrested you on December

25  20th 1983 for Penal Code 647f, drunk in public. You

1  were convicted, placed on one year probation, five days

2  in the county jail.  Berkeley Police Department

3  arrested you on March 12th 1984 for violation of Vehicle

4  Code 23152b, driving under the influence.  You were

5  convicted, placed on 3 years probation, sentenced to

6  120 days in the county jail.

7       Berkeley Police Department for Penal Code 242,

8  battery, arrested on August 16th 1984.  You pled guilty,

9  sentenced to one year probation and sixty days

10  suspended sentence.  Do you remember sir?  That was

11  1984.  Do you remember what that battery was?

12       **INMATE LOVE:**  Yeah, fighting in the streets, in

13  front of a club.

14       **PRESIDING COMMISSIONER BRYSON:**  And let's see, at

15  the time, that was '84.  You were about 39 or, excuse

16  me, 29 years old at that time.  Why were you fighting

17  in the streets sir?  Do you remember what happened?

18       **INMATE LOVE:**  No, it was, I can't recollect.

19       **PRESIDING COMMISSIONER BRYSON:**  Okay.  Oakland

20  Police Department issued you a citation January 4th 1983

21  for violation of Vehicle Code 23152a, DUI; Penal Code

22  417a, brandishing a firearm.  You were convicted and

23  sentenced to nine months in the county jail.  So that

24  was brandishing a firearm, driving under the influence.

25  Do you remember that crime?

1       **INMATE LOVE:**  Yes ma'am.

2       **PRESIDING COMMISSIONER BRYSON:**  What were you doing

3   drunk and brandishing a firearm?

4       **INMATE LOVE:**  Being a fool.  And, you know, --

5       **PRESIDING COMMISSIONER BRYSON:**  And you laughed at

6   that time.  Why was that?

7       **INMATE LOVE:**  Well, the reason I laughed is, you

8   know, it was just me thinking back on the foolish things

9   that I've done.

10      **PRESIDING COMMISSIONER BRYSON:**  Do you think that

11  was pretty risky behavior at that time?

12      **INMATE LOVE:**  Yes.

13      **PRESIDING COMMISSIONER BRYSON:**  You think you could

14  have killed somebody at that time?

15      **INMATE LOVE:**  Yes.

16      **PRESIDING COMMISSIONER BRYSON:**  Okay.  Oakland

17  Police Department arrested you March 15th 1985 for

18  Vehicle Code 23152b, driving under the influence.  You

19  were convicted, placed on 3 years probation and

20  sentenced to 180 days in the county jail.  And then

21  there was the commitment offense.

22      You were born to Ruthie Ellen and Johnny Love.

23  Your father passed away in 1970, so that would have

24  been when you were about 15 years old.  You were raised

25  in the berry (ph) and lived there as an adult until

1  your arrest for the incident offense.  You're one of

2  two children.  This says you don't know much about your

3  sister Lucille other than she lives in Los Angeles and

4  is now married.  Is that correct?

5      **INMATE LOVE:**  Yes.

6      **PRESIDING COMMISSIONER BRYSON:**  Do you keep in

7  touch with her?

8      **INMATE LOVE:**  Now I do, yes.

9      **PRESIDING COMMISSIONER BRYSON:**  Now you do.  Okay,

10  great.  You worked for, let's first talk about your

11  schooling.  This says that you attended school at

12  Berkeley High School dropping out in the tenth grade.

13  Why did you drop out early?

14      **INMATE LOVE:**  Being into devilment and what-not and

15  --

16      **PRESIDING COMMISSIONER BRYSON:**  I'm sorry sir.

17  Being in --

18      **INMATE LOVE:**  Being into a lot of devilment.

19      **PRESIDING COMMISSIONER BRYSON:**  Devilment?

20      **INMATE LOVE:**  Foolishness, yes.

21      **PRESIDING COMMISSIONER BRYSON:**  Okay.

22      **INMATE LOVE:**  And getting caught up out in the

23  streets and just playing hooky.

24      **PRESIDING COMMISSIONER BRYSON:**  What kind of

25  student were you do you think?  Were you a good student

1    or --

2         **INMATE LOVE:**  When I went, yes.

3         **PRESIDING COMMISSIONER BRYSON:**  And why did you

4    play hooky?

5         **INMATE LOVE:**  Guys, got sidetracked to trying to be

6    cool, fitting in.

7         **PRESIDING COMMISSIONER BRYSON:**  This says you

8    worked for Oscar E. Erickson Construction Company in

9    Richmond for 11 years, as a laborer at Richmond Chevron

10   Oil Refinery.  I'm not sure those are all the same

11   thing, but, so is that true you worked for that firm

12   for 11 years?

13        **INMATE LOVE:**  Yes ma'am.

14        **PRESIDING COMMISSIONER BRYSON:**  Okay.  It says you

15   worked as a security guard prior to that.  And you were

16   a member of Union Local 324 in Martinez.  Is it true

17   you were a security guard?

18        **INMATE LOVE:**  Yes, part-time.

19        **PRESIDING COMMISSIONER BRYSON:**  Part-time?

20        **INMATE LOVE:**  Yes.

21        **PRESIDING COMMISSIONER BRYSON:**  For what were you a

22   security guard?  What company?  Do you remember?

23        **INMATE LOVE:**  No, I don't remember the company, no.

24        **PRESIDING COMMISSIONER BRYSON:**  Was it a private

25   security company, or was it one of the oil companies?

1      **INMATE LOVE:**  No, it was a private security

2    company.

3      **PRESIDING COMMISSIONER BRYSON:**  I see. Did you

4    carry a weapon?

5      **INMATE LOVE:**  No.

6      **PRESIDING COMMISSIONER BRYSON:**  Let me just get

7    this clear.  You have a security job in which you don't

8    carry a weapon, but you do carry a weapon, loaded in

9    your private life?  Is that true?

10     **INMATE LOVE:**  Yeah.

11     **PRESIDING COMMISSIONER BRYSON:**  Okay.  This says

12   you've never been in the military.  No hobbies are

13   noted.  You were married to R-A-Y-N-A, Rayna Plumber?

14     **INMATE LOVE:**  Yeah.

15     **PRESIDING COMMISSIONER BRYSON:**  Okay.  In 1977, and

16   you were divorced in 1998.  You have two children from

17   that marriage, Aubrey D. Love and Lynell Love.  Are

18   those boys?

19     **INMATE LOVE:**  I have two boys.

20     **PRESIDING COMMISSIONER BRYSON:**  Okay.

21     **INMATE LOVE:**  That's Aubrey D --

22     **PRESIDING COMMISSIONER BRYSON:**  Aubrey D, right.

23     **INMATE LOVE:**  -- and Charles.

24     **PRESIDING COMMISSIONER BRYSON:**  I see.

25     **INMATE LOVE:**  Charles is Lynell.

32

1    **PRESIDING COMMISSIONER BRYSON:**  This doesn't say

2    that, so this is wrong then.  Okay.  All right, because

3    this says Lionel Love.

4        **INMATE LOVE:**  No, Lynell.

5        **PRESIDING COMMISSIONER BRYSON:**  Lynell.  Thank you.

6    That's my apology.

7        **INMATE LOVE:**  That's his middle name.  That's

8    Charles' middle name.

9        **PRESIDING COMMISSIONER BRYSON:**  I see, okay, thank

10   you.  L-Y-N-E-L-L, for the transcriber.  And then you

11   have fathered two children by Cathy Parker.  Is that

12   right?

13       **INMATE LOVE:**  Yes.

14       **PRESIDING COMMISSIONER BRYSON:**  That would be

15   Chikela (sp) Love?

16       **INMATE LOVE:**  Yes.

17       **PRESIDING COMMISSIONER BRYSON:**  And Dante (sp)

18   Love.

19       **INMATE LOVE:**  Yes.

20       **PRESIDING COMMISSIONER BRYSON:**  Okay.  Then it says

21   you fathered another child by Cynthia Brown.  This

22   would be Aubrey L.

23       **INMATE LOVE:**  Junior, Right.

24       **PRESIDING COMMISSIONER BRYSON:**  Junior.  Okay.  All

25   right.  So that's five children.  Is that correct?

33

1     **INMATE LOVE:**  Yes ma'am.

2     **PRESIDING COMMISSIONER BRYSON:**  And do you keep in

3   touch with all of them?

4     **INMATE LOVE:**  Yes.

5     **PRESIDING COMMISSIONER BRYSON:**  Outstanding.  How

6   are they?  How are they doing?

7     **INMATE LOVE:**  Well, one is lost in the system.

8     **PRESIDING COMMISSIONER BRYSON:**  What does that mean

9   sir?  Lost in --

10    **INMATE LOVE:**  In Folsom.

11    **PRESIDING COMMISSIONER BRYSON:**  I see.  Okay.

12    **INMATE LOVE:**  And everybody else is doing okay.

13    **PRESIDING COMMISSIONER BRYSON:**  Well, that's good.

14    **INMATE LOVE:**  Yeah.

15    **PRESIDING COMMISSIONER BRYSON:**  And the one that's

16  lost in the system, do you communicate with him?

17    **INMATE LOVE:**  Yes.

18    **PRESIDING COMMISSIONER BRYSON:**  Well, that's good.

19    **INMATE LOVE:**  That's Dante.

20    **PRESIDING COMMISSIONER BRYSON:**  All right.  Is

21  there anything about your personal life that you'd like

22  to share with this panel to help us understand you?

23    **INMATE LOVE:**  Well I, you know, come up in life,

24  abusive family.

25    **PRESIDING COMMISSIONER BRYSON:**  Did you have a good

1  upbringing do you think?

2      **INMATE LOVE:** Yes.  Just bad choices.

3      **PRESIDING COMMISSIONER BRYSON:** Was your Mom aware

4  that you were making some of these bad choices, or were

5  you --

6      **INMATE LOVE:** Yeah, I was coached well by my Mom in

7  regards to trying to better myself.  I come up in a

8  godly family oriented.

9      **PRESIDING COMMISSIONER BRYSON:** Were you ever

10 running with gangs in the neighborhood?

11     **INMATE LOVE:** No, I'm not a gang member.

12     **PRESIDING COMMISSIONER BRYSON:** Not a gang member?

13 Okay.  If you think of anything specific you'd like to

14 tell, you're welcome to at any time.  Meanwhile, I'd

15 like you to turn your attention to Commissioner -

16     ATTORNEY DAVEY:  Commissioner, just on a short

17 note, his high school education.  In that same

18 paragraph, he dropped out in tenth grade, but he later

19 went back to school and received a GED in '85.  I don't

20 know if you covered that.

21     **PRESIDING COMMISSIONER BRYSON:** Thank you.  I

22 appreciate that, and I did mention before when we were

23 discussing the ADA that he had achieved his GED; but I

24 appreciate that, that addition.  So if you'll turn your

25 attention to Commissioner Harmon, he'll talk about your

*WPU, Inc.*

1  post-conviction factors.

2  **DEPUTY COMMISSIONER HARMON:**  Yes, good morning Mr.

3  Love.

4  **INMATE LOVE:**  Good morning.

5  **DEPUTY COMMISSIONER HARMON:**  I want you to, first

6  of all, listen very carefully.  And what we're gonna do

7  is we're going to make sure that the record is up-to-

8  date.  If there's errors in the information, please let

9  me know, and we'll correct it.  It does show your last

10  hearing was November 15th of '05.  At that time you

11  received a two year denial.  That represented

12  subsequent hearing number one.  You were received at

13  Solano May 22nd of '02 from Folsom State Prison.  Your

14  custody level today is medium A, and your revised class

15  score is 19.  Does that all sound right?

16  **INMATE LOVE:**  Yes sir.

17  **DEPUTY COMMISSIONER HARMON:**  Okay.  We'll start out

18  here by focusing primarily on the period of time since

19  your last hearing to bring us up-to-date.  And to do

20  that, I'll utilize your counselor's report.  Listen

21  very carefully.  I emphasize that I'll only use parts

22  of it, and if I leave out areas that are important to

23  you and your attorney, I will give you an opportunity

24  to correct that.

25  The counselor starts out from September 17th of '05

56

1    to March 1st of '06, and it says that during this review

2    period you remained at CSP, Solano, in the general

3    population, medium A custody, during the entire review

4    period.  There was no vocational training, no

5    academics.  You were assigned as a building porter.  It

6    shows that you completed in November of '05 a

7    relationship awareness workshop, and you also has

8    received a chrono for participation in AA in the third

9    quarter ending in September of '06.

10        There was no psychiatric treatment.  There were no

11    disciplinary issues.  From March 2nd of '06 to March 1st

12    of '07, once again you remained at Solano during the

13    entire review period, medium A custody, in the general

14    population.  Once again no vocational training, no

15    academics.  You continue your assignment as a building

16    porter until you were reassigned on April 22nd of '06 to

17    the PIA metal fab position as a welder.  And you were

18    receiving satisfactory and above average work reports.

19        And it also shows that you had continued in AA

20    during that third quarter, ending in September of '06.

21    And you received another chrono indicating your

22    participation in the first quarter of '07.  There was

23    no psychiatric treatment during this period.  There was

24    no disciplinary issues.  It does show that in June of

25    '06, you received a support letter from your cousin,

1  Curtis Quinn; and for the transcriber, that's Q-U-I

2  double N.

3      From March 2nd of '07 to September 26th of '07, once

4  again, there are no changes; Solano, general

5  population, medium A custody, during the entire review

6  period, no vocational training, no academics.  Does

7  show that you remain assigned in PIA metal fab as a

8  welder.  There are no work supervisor reports available

9  during this review period.  And, once again, you

10  continue in AA.

11      No psychiatric treatment, no disciplinary issues,

12  and it does show that on July 24th of '07 you received a

13  certificate proficiency in PIA as a painter sprayer I.

14  And the counselor ends this around October of '07, so

15  it's fairly current.  Did the counselor cover that area

16  pretty well?

17      **INMATE LOVE:**  Yes sir.

18      **DEPUTY COMMISSIONER HARMON:**  Is there anything

19  you'd like to add to that at this point?

20      **INMATE LOVE:**  No sir.

21      **DEPUTY COMMISSIONER HARMON:**  Okay.  Let me, let's

22  bring up up-to-date then.  Can you kind of give us an

23  idea of what your current assignment is as of this week

24  and what you're doing with your free time?

25      **INMATE LOVE:**  I'm still working in PIA, metal fab.

58

1   I'm a welder and a painter working with CalTran.

2       **DEPUTY COMMISSIONER HARMON:** Okay. And what are

3   you doing in your free time? What do you do? Give us

4   an idea of how Mr. Love lives during the week.

5       **INMATE LOVE:** Study. Study, write letters.

6       **DEPUTY COMMISSIONER HARMON:** Can you tell us what

7   you're studying, say for the last year.

8       **INMATE LOVE:** Well, I'm doing some bible studies.

9   Just basic reading.

10      **DEPUTY COMMISSIONER HARMON:** Okay, anything other

11  than bible studies? Are you doing anything, for

12  instance, in the area of self-help?

13      **INMATE LOVE:** Oh, yes. I participate in AA. I'm

14  signed up for various self-help groups, you know.

15  Anger management, you know, it's a long list for that.

16  I continue to deal with that, you know.

17      **DEPUTY COMMISSIONER HARMON:** Okay. Are you doing

18  any correspondence work? Are you going to the library?

19  If we were to send an investigator out, and check out

20  the books you've checked out for the last five years,

21  what would it tell us?

22      **INMATE LOVE:** I don't check out books. I normally

23  would order books, you know, just basic black

24  literature.

25      **DEPUTY COMMISSIONER HARMON:** Okay. Can you give us

39

1  some black literature that you've read recently?

2      **INMATE LOVE:** Yeah, autobiography on Malcolm X,

3  Martin Luther King, George Jackson.

4      **DEPUTY COMMISSIONER HARMON:** Have any of these

5  books helped you in any way in getting a better

6  understanding of maybe your life prior to prison?

7      **INMATE LOVE:** Yes.

8      **DEPUTY COMMISSIONER HARMON:** Can you explain that?

9      **INMATE LOVE:** I could have been a better person as

10 a black man in my community, in helping my kids coming

11 up as well as, you know, just doing, being a little

12 more productive. I guess it's an ongoing struggle, you

13 know, from where I'm at.

14     **DEPUTY COMMISSIONER HARMON:** You mean today?

15     **INMATE LOVE:** Today, yesterday and everything. It

16 all fits in.

17     **DEPUTY COMMISSIONER HARMON:** Okay. Let's talk

18 about other things. Do you participate in arts in

19 corrections? Do you go out on the yard and recreate?

20     **INMATE LOVE:** Yes I do. I participate in

21 activities on the yard, handball, running the track,

22 basketball, communicating with the young brothers

23 that's caught up in this system.

24     **DEPUTY COMMISSIONER HARMON:** Do you, does your

25 bible study go to the church. Do you participate in

1  any church services?

2    **INMATE LOVE:** I do. I'm at church a lot of

3  Sundays. I'm more of a person that I believe in God.

4  You know, I'm not into the religion perspective of it,

5  because it's too many politics in that.

6    **DEPUTY COMMISSIONER HARMON:** Okay, so does that

7  kind of give us an idea of what you're all about, in

8  November of '07?

9    **INMATE LOVE:** November 07, I'm a person that looks

10  back on a lot of the things that I've done. I'm not

11  pleased with a lot of 'em, but yet I've made a drastic

12  change. It's an ongoing job. I look at life from a

13  different eye than I have before.

14    **DEPUTY COMMISSIONER HARMON:** Okay. Let's talk

15  about your accomplishments in prison. I've gone over

16  your files, and what I've uncovered here is that you've

17  held a variety of jobs, first of all. Covering some of

18  those jobs, you've worked in recycling, clothing, your

19  current painter position. You've worked porter

20  positions and, of course, metal fab.

21    In the area of vocational areas, and you've

22  maintained good work reports, in '99 you completed the

23  janitorial maintenance program. And then you received

24  your recent certificate of proficiency as a painter

25  sprayer one. I noted that the certificate indicated

1  that you'd completed over 1500 hours in that phase of

2  work.  Then I noticed that you, back in '98, you had

3  been through the refrigeration and air conditioning

4  program, but the supervisor noted in the chrono that

5  you had not completed the core in recovery and

6  reclamation finals.  Did you ever complete those?

7      **INMATE LOVE:**  Yes, it should.  The certificates in

8  all of 'em is completed.

9      **DEPUTY COMMISSIONER HARMON:**  Okay.

10      **INMATE LOVE:**  It should be in my file.

11      **DEPUTY COMMISSIONER HARMON:**  Okay.  I haven't found

12  it yet.  That's why I'm asking.

13      **INMATE LOVE:**  Yes, everything.  Reclamation and

14  all.

15      **DEPUTY COMMISSIONER HARMON:**  Okay.  Education.  You

16  and the commissioner have covered that pretty well.  I

17  did note that in '99 you took a taped test, and it

18  showed a reading level of 6.8 and a total battery of

19  5.4.  In the area of self-help and group programs, '97

20  it looked like you started getting involved, and you

21  took the MVP program, violence prevention.

22      **INMATE LOVE:**  Yes.

23      **DEPUTY COMMISSIONER HARMON:**  And the record also

24  reflects that in 2000, while you were at Folsom, you

25  completed a substance abuse program that was for an

1   hour and a half I believe in ten segments there.  And

2   stress management (indiscernible) that was pointed out

3   by the counselor, and relationship awareness workshop

4   in '05.  And, how long have you been in AA on a regular

5   basis now?

6       **INMATE LOVE:**  Since I come down from the war zone,

7   well, Pelican Bay.  I would say, '93, '94, when I first

8   arrived here from Pelican Bay.

9       **DEPUTY COMMISSIONER HARMON:**  Okay, and I noted that

10  somewhere you wanted to be a facilitator in that area.

11  Do you know the 12 steps?  Can you give me the 12

12  steps?

13      **INMATE LOVE:**  Well, I don't give 'em one-by-one,

14  but through just randomly speaking on 'em, yes I can.

15  Primarily, most of them, and not all.

16      **DEPUTY COMMISSIONER HARMON:**  Tell me about the

17  fourth and the tenth steps and what they mean to you?

18      **INMATE LOVE:**  The fourth, I have made a fearless

19  and moral inventory of myself into something that

20  constantly do all the time, you know, and it's an

21  ongoing thing that I do do.  And, you know, it is

22  frightening looking back, you know, but also looking at

23  what I've accomplished in keeping myself clean and

24  sober and moving forward with that and working with

25  other people to do so as well.  You know, I find it

*WPU, Inc.*

1   pleasing to be able to do that now.  Number five --

2       **DEPUTY COMMISSIONER HARMON:**  What does the tenth

3   mean to you?

4       **INMATE LOVE:**  I don't know the tenth right off by

5   hand.

6       **DEPUTY COMMISSIONER HARMON:**  Okay.  And have you

7   been able to work through the eight and ninth?  And if

8   so, how have you done that?

9       **INMATE LOVE:**  Well, I'm constantly checking myself.

10  And if I am speaking of the right step.

11      **DEPUTY COMMISSIONER HARMON:**  Well, I don't wanna

12  get you off track.

13      **INMATE LOVE:**  Okay.

14      **DEPUTY COMMISSIONER HARMON:**  Let's get you, you

15  know, I'm not here to trick you.  You know, identifying

16  those that you've harmed.

17      **INMATE LOVE:**  Yes.

18      **DEPUTY COMMISSIONER HARMON:**  You remember that step?

19      **INMATE LOVE:**  Yes.

20      **DEPUTY COMMISSIONER HARMON:**  You wanna finish it for

21  me?

22      **INMATE LOVE:**  Acknowledging the people whom I've

23  harmed and, if possible, making amends.

24      **DEPUTY COMMISSIONER HARMON:**  So --

25      **INMATE LOVE:**  And acknowledging the fact and going

1  through and what-not.

2      **DEPUTY COMMISSIONER HARMON:**  So, what have you done

3  in those areas?

4      **INMATE LOVE:**  I have made amends to those that I

5  could, and at this present time I wouldn't have a

6  problem doing so, because I didn't wanna go out of my

7  range and cause any problems with others in doing so.

8      **DEPUTY COMMISSIONER HARMON:**  Have you written the

9  letter yet?

10      **INMATE LOVE:**  No.

11      **DEPUTY COMMISSIONER HARMON:**  Is it something you

12  intend on doing?

13      **INMATE LOVE:**  I would feel better just verbally

14  speaking.

15      **DEPUTY COMMISSIONER HARMON:**  Okay.  And they're two

16  very important steps.  I didn't specifically find any

17  laudatories.  And there was no other self-help.  Now,

18  if I'm to look at this, and look at the number of years

19  that you've been down, you know, you need to beef up

20  that self-help and group programs.  That's a weak area.

21  I'm sure you're aware of it.  At least not so much

22  through you today, but I think even the doctor has

23  addressed some issues.  And I was gonna ask you.  Well,

24  we'll talk about that a little later.

25      Never had a 115.  Never had a 128.  That's

1   commendable. I guess my question to you at this time.

2   There's not too many people that come forward with no

3   disciplines of some type. What do you account for

4   being able to stay out of trouble for that many years?

5     **INMATE LOVE:** I'm just missing the foolishness. I

6   mean, I'm around it. I mean, you know, you people,

7   ya'll are sitting over there. You know what's here.

8   You know, and I just avoid it. I'm around more in here

9   than I was on the street. So it's just with my

10   wording, I just on another path. I've been through it.

11   I refuse to go through it again.

12     **DEPUTY COMMISSIONER HARMON:** Did you complete a

13   thought?

14     **INMATE LOVE:** Excuse me?

15     **DEPUTY COMMISSIONER HARMON:** Did complete a

16   thought? I didn't want to interrupt you.

17     **INMATE LOVE:** Yes I, yes.

18     **DEPUTY COMMISSIONER HARMON:** Okay. Okay. Now I'm

19   gonna on to the doctor's reports. And before I do have

20   I, first of all, missed out anything that's important

21   to you in terms of your accomplishments?

22     **INMATE LOVE:** No, because it's something that I'm

23   continuing to do.

24     **DEPUTY COMMISSIONER HARMON:** Okay. I'd like to ask

25   two very important questions, because I'm handling

46

1  everything from when you came into prison to where we

2  are today.  So the first question is, do you believe

3  you still pose a risk to the safety of the people

4  outside of the prison walls?

5      **INMATE LOVE:**  No.

6      **DEPUTY COMMISSIONER HARMON:**  And what do you

7  believe makes you a different man today than the man

8  who came into prison for the life crime?

9      **INMATE LOVE:**  First and foremost, I'm clean and

10  sober.  I look back at a lot of things and acknowledge

11  the fact that a lot has been done.  A lot of people

12  that's been hurt, you know.  My mission now is to be a

13  better person, to help others, work with my community

14  and like I was saying earlier, to try to save some of

15  the kids out there.  It's a lot of 'em at stray right

16  now, you know, especially in the Bay area; and being a

17  participant in that, you know.

18      And because what I see in this system now, it's a

19  lot of youngsters coming in here.  There's no direction

20  out in society, and they come in here really blind.

21  And I'm saddened by it, and it's needing some strong

22  people out there to give 'em some guidance, instead of

23  leading them directly into this madhouse.

24      **DEPUTY COMMISSIONER HARMON:**  Okay.  What I do is I

25  take parts of the two most recent doctor's reports,

1   And, once again, I ask that you listen very carefully.
2   And I'll take parts of those reports, and if I leave
3   out areas that are important to you, I'll give you an
4   opportunity to respond.  The new report is completed by
5   Dr. Starrett, that's S-T-A, double R-E, double-T for
6   the transcriber.  That report was completed in October
7   of '07.

8       And the doctor starts out with your history that
9   you and the commissioner here have covered.  I'm not
10  going to go directly into all of that, but I am gonna
11  go to the area starting on page 4 that deals with the
12  life crime.  Since you're not discussing it today the
13  doctor, first of all, starts out with the prisoner's
14  version as described in an interview on June 18th of
15  '01.  And there's no real need to go into that at this
16  point, but the doctor does say,

17          "During an interview with Love on April 13th
18      of '07, he stated his version remains the same."
19      And then the doctor goes on,

20          "The inmate was given the opportunity to
21      read the 2007 version of his account.  He
22      offered no argumentations, augmentation,
23      clarifications or corrections.  When asking the
24      inmate why this crime occurred, the inmate
25      states he was carrying the gun but that the

*WPU, Inc.*

48

1    shooting was not intentional.  Mr. Love states

2    he had the weapon because he was living in the

3    area in the ghetto that was drug-infested, and

4    he was carrying it for protection.

5        The inmate states he shot the victim out of

6    anger.  He offered that he had been drinking,

7    and he was pushed down the stairs, and he shot

8    back to scare the victim.  The inmate states he

9    'loved her'.  In reference to the victim he

10   surmised that the problem with the relationship

11   was that he relapsed into drinking, and she

12   relapsed into using cocaine.  The inmate states

13   that there is no excuse for his behavior.  He

14   accepts responsibility, and he's sorry."

15   Under mental health concerns, or personality

16   disorders, the doctor writes,

17       "The inmate has no current mental health

18   problems.  He would meet the diagnostic criteria

19   for alcohol dependency in controlled environment

20   remission.  The inmate would also meet the

21   diagnostic criteria for adult antisocial

22   behavior.  Under diagnostic compressions under

23   Axis I, alcohol dependence in controlled

24   environment remission, adult antisocial

25   behavior, Axis II, no diagnosis on Axis II and

1        Axis V a GAF score of 90."

2        The doctor then goes briefly into previous

3   evaluation summaries and then goes into violence risk

4   assessment conclusions under VII and addresses several

5   questions here that have been asked of him.  And the

6   first one is the prisoner's violence potential in the

7   free community.  And the doctor responds, after using

8   various tools or instruments to come to his findings.

9        The first scoring is the PCLR, and that's a

10  instrument that was scored to access the inmate's level

11  of psychopathy, a trait that has been linked to

12  episodes of repetitive aggression and criminality.  And

13  then also the HCR20, excuse me.  As to the PCR, the

14  inmate scored in the low range of psychopathy.  And

15  then the doctor goes into the HCR20 and starts out with

16  using historical data and says,

17          "The historical factors rate the inmate in

18      the moderate range in propensity for future

19      violence.  This rating is based on his age at

20      the time of his first violence, past arrest

21      history, being involved in unstable

22      relationships, being a substance abuser, being

23      on prior supervision and, to a lesser extent,

24      not establishing a career."

25      As to clinical insight, that domain, the doctor

1    writes,

2        "The inmate would rate in the low range in

3     his propensity for future violence. In this

4     factor, the inmate does not have a negative

5     attitude. He does not have active mental health

6     symptoms, and he is not impulsive. His insight

7     seems appropriate to his cognitive functioning."

8    As to risk management, the doctor writes,

9       "The inmate would rate in the low range in

10     the risk management factor. The inmate's

11     overall propensity for violence is in the low on

12     the factors involved in this particular

13     instrument. As to the LSCMI testing, this

14     instrument was scored based on data from the

15     inmate's records and information obtained in the

16     current interview for level of future risk for

17     general recidivism and not violence per se. The

18     inmate's general recidivism risk is rated in the

19     low range."

20    Under the heading of overall risk assessment, the

21    doctor writes,

22       "The inmate's level of psychopathy is in

23     the low range. The inmate's overall propensity

24     for violence is in the low range compared to

25     similar inmates. The inmate's general



1      recidivism and risk is rated in the low range."

2          The doctor addresses the second question, is to the

3      issue of domestic violence and writes,

4              "Here, in part, the inmate clearly had

5          attitudes and behaviors that reflect a

6          behavioral pattern associated with domestic

7          violence.  Noteworthy, however, is that there

8          reportedly was an active restraining order

9          against the inmate by the victim and, thus,

10         there appears to be some potential relationship

11         problems for him; typically with power and

12         control issues.

13             The inmate does readily admit that he and

14         his wife used to argue, and if she slapped him,

15         he would slap her back.  He minimized, however,

16         that he never hit a woman with closed fists.

17         The inmate realizes that his self-help needs

18         include focusing on relationship, anger

19         management, victim awareness and women's issues

20         regarding relationships.

21             At the current time, it cannot be

22         recommended that the inmate be in any intensive

23         therapy or relationship counseling to deal with

24         these issues, primarily because such is not

25         available within the system.  Additionally, this

1    individual is in the general population and does

2    not qualify for inclusion in the mental health

3    treatment population and, thus, access to formal

4    psychotherapeutic involvements."

5    And that's part of Dr. Walker's, excuse me, Dr.

6    Starrett's report.  The previous evaluation was

7    December of '04, and that particular report was from

8    Dr. Davis, D-A-V-I-S.  And in that particular report,

9    he once again starts out with your history.  And under

10   the heading of Mental Health Psychological Evaluation,

11   the doctor, under the heading of Thinking, the doctor

12   writes,

13       "Breadth of thought was broad and

14   commensurate with his life experience.  Logic

15   was goal-directed and linear.  His short and

16   long-term memories appeared in tact."

17   Under mood and affect,

18       "His mood was described as good.  His

19   affect was full range and appropriate to his

20   expressed thoughts and his situation.  His modes

21   of expression were facial, vocal and gestural,

22   and his intensity range and emotional regulation

23   were all within normal limits."

24   Under insight,

25       "His insight into his crime involvement,

1          lack of mental symptoms and his overall

2          situation appears in tact.  He takes blames for

3          his role and sees his prior judgment as poor.

4          Current judgment seems sound."

5      Under diagnosis under Axis I, alcohol dependence in

6    full sustained remission; Axis II, no diagnosis in Axis

7    II; in Axis V, a GATH score of 80.  The doctor goes

8    into the review of the life crime briefly, and under

9    the heading of Estimated Future Dangerousness in the

10   Community and Significant Risk Factors, the doctor

11   writes,

12         "He fully acknowledges involvement in the

13         crime he committed.  He feels sorrow, empathy

14         and regret for his involvement.  And given his

15         reported history in the files reviewed, and from

16         interview and psychological evaluation of this

17         inmate on December 6th of '04, he appears to

18         show a moderate risk of dangerousness if

19         released to the public at this time."

20     And that was from Dr. Davis in December of '04.  So

21   Mr. Love, as I indicated to you I would take parts of

22   the two most recent doctors' reports, or to your

23   counselor's reports, and parts of your entire

24   institutional adjustment.  Now I may have left out

25   areas that are important to you and your attorney here.

54

1    I'm gonna return to the Chair, 'cause we're gonna go

2    into your parole plans and questioning.  Before we do,

3    is there anything you wish to add to the areas that I

4    covered today?

5        **INMATE LOVE:**  No.

6        **DEPUTY COMMISSIONER HARMON:**  Counselor?

7        **ATTORNEY DAVEY:**  No, I don't believe so sir.

8        **DEPUTY COMMISSIONER HARMON:**  Thank you.  I'll

9    return to the Chair.

10       **PRESIDING COMMISSIONER BRYSON:**  Sir, the board

11   report states that, if granted parole, you plan to live

12   with your cousin Janet Rogers in Richmond.  Is that

13   correct?

14       **INMATE LOVE:**  Well, I would really, her or my

15   cousin Curtis.

16       **PRESIDING COMMISSIONER BRYSON:**  And if we can clear

17   this up for the record, because I believe this cousin's

18   name was read into the record a little earlier as

19   Quinn, Q-U-I-N-N, but it is actually Guinn, G-U-I-N-N.

20   Is that correct?

21       **INMATE LOVE:**  G-U-I-N-N, yes.

22       **PRESIDING COMMISSIONER BRYSON:**  Right.  All right.

23   So your main plan would be to live with your cousin

24   Curtis then.  Is that correct?  Would you --

25       **INMATE LOVE:**  Yes.  Both of 'em are stable places,

55

1  but that's where the job in --

2      **PRESIDING COMMISSIONER BRYSON:**  That's what I saw.

3      **INMATE LOVE:**  -- and everything else is

4  established, right.

5      **PRESIDING COMMISSIONER BRYSON:**  All right.  And I

6  did see a support letter.  Let's go over that from

7  Curtis L. Guinn, G-U-I-N-N.  And this is dated June 6th

8  of 2006, so actually it's about a year and a third old

9  now at this point; but he states,

10      "My name is Curtis Guinn.  I'm Aubrey

11      Love's cousin."

12      This is a character reference on behalf of Mr.

13  Love, and he says he's known you since early childhood.

14  He says he's an active member who attends church

15  services regularly and bible studies, Sunday school.

16      "I'm a homeowner and a businessman in

17      Alameda County."

18      Does he have a sole proprietorship, or what kind of

19  business does he have?

20      **INMATE LOVE:**  Properties.

21      **PRESIDING COMMISSIONER BRYSON:**  All right.  So does

22  he have a sole proprietorship or a corporation?  Do you

23  know.

24      **INMATE LOVE:**  What do you mean?

25      **ATTORNEY DAVEY:**  Commissioner, I don't know if my

1  client understands the concept of sole proprietorship

2  versus corporation, and --

3      **PRESIDING COMMISSIONER BRYSON:**  All right.  The

4  question then sir is, is he the only person in his

5  business?

6      **INMATE LOVE:**  Yeah, he's the sole owner, yes.

7      **PRESIDING COMMISSIONER BRYSON:**  He's the sole

8  owner.  And what's the name of his business?

9      **INMATE LOVE:**  Well it's his, it's property.  He

10  owns homes.  He rents 'em out, apartments and what-not

11  like that.

12      **PRESIDING COMMISSIONER BRYSON:**  So you don't know

13  the name --

14      **INMATE LOVE:**  No ma'am.

15      **PRESIDING COMMISSIONER BRYSON:**  -- in which he goes

16  for IRS?  All right.  Does he employ anyone else, or is

17  it just himself at this point?

18      **INMATE LOVE:**  No, he has other employees, yeah.

19      **PRESIDING COMMISSIONER BRYSON:**  How many?

20      **INMATE LOVE:**  I don't know that.

21      **PRESIDING COMMISSIONER BRYSON:**  And what would you

22  do for him?

23      **INMATE LOVE:**  Probably the upkeep, air conditioner,

24  refrigeration, painting, keep the places up.

25      **PRESIDING COMMISSIONER BRYSON:**  What kinds of

57

1  properties are they?

2       **INMATE LOVE:**  Apartments.

3       **PRESIDING COMMISSIONER BRYSON:**  Apartments.

4       **INMATE LOVE:**  Yes.

5       **PRESIDING COMMISSIONER BRYSON:**  And are they in

6  Oakland, did you say?

7       **INMATE LOVE:**  Yes.

8       **PRESIDING COMMISSIONER BRYSON:**  All right.  He

9  says,

10      "I've maintained contact with Aubrey through his

11  incarceration."

12      Talks about your being caught up in the street

13  life.  He says "despite the advice given to him by

14  family members".  And he says you've made a positive

15  change.  You'd be a law abiding citizen.  He believes

16  you have been saved by the Lord, and he says that it's

17  obvious through your communications that you're a

18  changed person.  You've gained knowledge and skills,

19  and he mentions your marketable skills.  He says,

20           "I was grateful to hear that Aubrey had

21      chosen areas of my expertise.  I supervised and

22      managed those particular trades in my previous

23      employment with the State of California,

24      Department of General Services, Office of

25      Building and Grounds Division for 30+ years."

1  He says,

2      "My present position at this time allows me

3      the opportunity to offer or provide a place for

4      Aubrey to live.  With the current skills he has

5      obtained in janitorial and painting, he will be

6      useful working with me and maintaining my rental

7      properties. "

8  All right, and he does provide contact information.

9  Then you said your-- another plan would be with your

10 cousin Janet Rogers.  Do we have any documentation from

11 her?

12     **INMATE LOVE:**  Well I had, she had a support letter,

13 and I gave it to my counselor.  And I, you know, some

14 way it got lost with this lifer's desk out here, you

15 know, which they do frequently; but, you know, she's in

16 the process of sending some more, because she's quite

17 busy herself.

18     **PRESIDING COMMISSIONER BRYSON:**  I see.

19     **INMATE LOVE:**  But she's out in Richmond on

20 Arlington, in the hills.

21     **PRESIDING COMMISSIONER BRYSON:**  I see.  This says

22 you might also seek employment with your prior

23 employer, Oscar & Erickson Construction Company as a

24 laborer.  Have you been in contact with them at all?

25     **INMATE LOVE:**  I stay in touch with my union.

1    **PRESIDING COMMISSIONER BRYSON:** And that's North

2    American Local 324?

3        **INMATE LOVE:** 324, yes.

4    **PRESIDING COMMISSIONER BRYSON:** Okay. And you have

5    plans to attend AA on the outside. Is that correct?

6        **INMATE LOVE:** Yes.

7    **PRESIDING COMMISSIONER BRYSON:** Okay. All right,

8    is there anything else that I've missed, or counsel?

9        **ATTORNEY DAVEY (to INMATE LOVE):** Church

10   (indiscernible).

11   **INMATE LOVE:** Yes. Participate in church

12   activities and what-not ma'am.

13   **PRESIDING COMMISSIONER BRYSON:** All right.

14   **INMATE LOVE:** Yeah. You know, reaching back, you

15   know, once I share with them, you know. Working with

16   the community, that's my thing now. You know, I wanna,

17   it's a need.

18   **PRESIDING COMMISSIONER BRYSON:** All right. We sent

19   out 3042 notices. Those notices go to agencies having

20   an interest in your case. We do have a representative,

21   the Alameda County District Attorney's Office, present

22   who will have the opportunity to make a statement

23   regarding parole suitability prior to the conclusion of

24   this hearing.

25       And first, Commissioner Harmon, do you have any

*WPU, Inc.*

1  questions regarding anything that needs to be

2  discussed?

3      **DEPUTY DISTRICT ATTORNEY KLINGE:**  Actually, I'm

4  sorry to interrupt.  The victim's next of kin indicated

5  they need a comfort break.

6      **PRESIDING COMMISSIONER BRYSON:**  Absolutely.  We'll

7  take a short break, and that'll be 9:54.

8                    (Recording stopped)

9                    **BRIEF RECESS**

10                    --o0o--

11      **DEPUTY COMMISSIONER HARMON:**  You're on record.

12      **PRESIDING COMMISSIONER BRYSON:**  We're back on

13  record.  The time is now 10:02.  We've reconvened from

14  a brief recess.  And I was asking Commissioner Harmon

15  if you have any questions of this inmate at this time?

16      **DEPUTY COMMISSIONER HARMON:**  Yes.  Mr. Love, I'm

17  simply looking for some clarification on some things

18  here.  Back in 1989 you were stabbed pretty seriously.

19  That was prior to the arrest on this?

20      **INMATE LOVE:**  Mmm-hmm.

21      **DEPUTY COMMISSIONER HARMON:**  And was that involving

22  your drinking?  Wasn't there cousins involved?

23      **INMATE LOVE:**  Yeah, but that wasn't involved in my

24  drinking.  It was involved in whatever was occurring

25  within the household, that brought, you know, anger.

1  It was just a lot anger going on in the household.  The
2  cousins was called for whatever reason.  I don't even
3  know what occurred for them to come, but they were
4  there, --

5      **DEPUTY COMMISSIONER HARMON:**  Okay, let me --
6      **INMATE LOVE:**  -- knife popped up, and --
7      **DEPUTY COMMISSIONER HARMON:**  You were the only one
8  stabbed?
9      **INMATE LOVE:**  Right.
10     **DEPUTY COMMISSIONER HARMON:**  Why were you stabbed?
11     **INMATE LOVE:**  We were fighting, and one of the
12 cousins had got a knife.

13     **DEPUTY COMMISSIONER HARMON:**  I know all that.  I
14 know all that.  I just wanna know, why were you
15 stabbed?  Why didn't things just end and then you could
16 have walked out?

17     **INMATE LOVE:**  That aspect of what you're asking me
18 was, I had just come in from work that evening.  I had
19 just come in from work.  Yeah, yeah.  I had just come
20 in from work, all right.  Nobody was in the house.  I
21 leave.  I come back.  Pat's in the house.  She create a
22 commotion as though she was, you know, being hurt in
23 the house.  She called the police.  The police just pop
24 up at the house.

25     Shortly after the police, they say, well look,

1  you're gonna have to leave.  Okay.  He leaves.  The

2  police leave.  The cousins pop up.  We all in there

3  verbally talking.  We're talking.  They go in another

4  room.  One come back in, hits me.  We go to fighting.

5  The other one was handed a knife, and I got stuck.  I'm

6  busy fighting one, and the other one is sticking me.

7  And that was it.  That's what had happened at that time

8  you're speaking of.

9      **DEPUTY COMMISSIONER HARMON:**  Had you been drinking?

10     **INMATE LOVE:**  Yeah.

11     **DEPUTY COMMISSIONER HARMON:**  Okay.  Let's on a

12  little bit here.  In 1990, you were working at Grand

13  Auto as a security officer, weren't you?

14     **INMATE LOVE:**  Yes.

15     **DEPUTY COMMISSIONER HARMON:**  And then you were

16  terminated.

17     **INMATE LOVE:**  Right.

18     **DEPUTY COMMISSIONER HARMON:**  And that was for

19  sexually harassing a female employee?

20     **INMATE LOVE:**  Well, the words that was used, I

21  didn't know what I had stated to that female employee.

22  I didn't acknowledge that as being sexual harassment.

23  It was a comment I made.

24     **DEPUTY COMMISSIONER HARMON:**  But that's why you

25  were let go?

1    **INMATE LOVE:**  Yeah.  Because they say, the comment

2    I made to her, it was a person that I knew.  She was on

3    the down slope, and I told her she was getting slack in

4    the ass, more or less saying that she was using a

5    substance that was causing her to lose weight.  And she

6    took offense to it and blew it out, and blew it into

7    something as though, when I, when somebody's saying

8    sexual harassment, I take it as though you saying I'm

9    trying come on to you or I'm talking under your clothes

10   or something.  By me making that statement, it was more

11   or less me saying I'm acknowledging that you're losing

12   weight.

13   **DEPUTY COMMISSIONER HARMON:**  Okay.  Let's let move

14   on a little bit here.  I'm, like I said you're not on

15   trial.

16   **INMATE LOVE:**  Mmm-hmm.

17   **DEPUTY COMMISSIONER HARMON:**  I'm just looking for

18   clarification as to your history.  Now prior to this

19   homicide had you, over a three year period, harassed

20   and assaulted this victim before?

21   **INMATE LOVE:**  We've had our disturbances.

22   **DEPUTY COMMISSIONER HARMON:**  Did you ever assault

23   her to the point that she required hospitalization?

24   **INMATE LOVE:**  No. No.

25   **DEPUTY COMMISSIONER HARMON:**  Have you ever

1  assaulted any other woman other than this lady?

2    **INMATE LOVE:** No. Me and my wife, we've had our

3  disagreements at home, but it has never gotten blown

4  out of proportion, no.

5    **DEPUTY COMMISSIONER HARMON:** But you, you by your

6  own testimony before, you whipped your stepson quite a

7  bit, didn't you?

8    **INMATE LOVE:** I whup on my children when they do

9  wrong. I don't beat 'em. I whup 'em.

10    **DEPUTY COMMISSIONER HARMON:** Well, you know, he

11  wasn't your biological son. I know you whipped your

12  other sons, but why did you whip her son?

13    **INMATE LOVE:** This kid has been with me every since

14  he was one years old. He is my son. That's how I look

15  at it.

16    **DEPUTY COMMISSIONER HARMON:** Okay. I'm trying to

17  stay from the life crime here, so bear with me here.

18  You, from what I've read in the two hearings that

19  you've had, and going to the initial hearing, you made

20  a comment at the time that, and I'm referring to page

21  19, that this could have been your child. In fact,

22  your exact quote was "could have been my child", the

23  baby who died in this incident as well. Now without

24  talking about the incident, that statement that you

25  made to the panel "could have been child", leads me to

1   believe, could there've been issues regarding her being

2   pregnant, with you and her?

3      **INMATE LOVE:**  Okay.  To clarify that, since that

4   part is coming up, even though Pat was, was, how would

5   say, I'm saying that she wasn't around me, and there

6   was a little fear.  We did see each other --

7      **DEPUTY COMMISSIONER HARMON:**  Were you --

8      **INMATE LOVE:**  -- after the events of the battle and

9   everything.  But, you know, it was some fear still

10  there.

11     **DEPUTY COMMISSIONER HARMON:**  Okay. Okay.  You're

12  referring to her as Pat.  Was Pat --

13     **INMATE LOVE:**  Patricia.

14     **DEPUTY COMMISSIONER HARMON:**  Patricia.  I mean no

15  disrespect to the family.  Had you and her argued prior

16  to the homicide about her relationships with other

17  women, I mean other men?

18     **INMATE LOVE:**  No.

19     **DEPUTY COMMISSIONER HARMON:**  You at the last

20  hearing, by your own statements, and I'll refer and you

21  don't have to answer this but I'm looking for

22  clarification.

23     **INMATE LOVE:**  Mmm-hmm.

24     **DEPUTY COMMISSIONER HARMON:**  In the '05 hearing,

25  you said on page 41, line 17, 18 and 19, that this

1  particular shooting was not intentional out of anger,

2  and then going to page 42, you said that it was a

3  fluke; which leads me to believe that you believed that

4  this was an accident.  Is that the way you feel, or am

5  I misunder--, not understand what you're saying?

6      **INMATE LOVE:**  Well, saying fluke, the word

7  accident, I know how ya'll feel about the word

8  accident.  When I used those words, I'm saying that

9  shooting up there, I was not intentionally trying to

10  hit the victim.  It was more of a scare tactic, because

11  it was nighttime, and out of anger I just shot up

12  there.  And, like we say, she was peeping out of the

13  door.  I was shooting at the door, just in a sense to

14  scare her.  I wasn't aiming like to hurt you, no.  It

15  wasn't nothing like that.

16      **DEPUTY COMMISSIONER HARMON:**  Okay, so if you were

17  to give me one word as to what happened, what would

18  that be, if it wasn't an accident?

19      **INMATE LOVE:**  Bad decision.

20      **DEPUTY COMMISSIONER HARMON:**  Okay.  Okay, and thank

21  you very much sir.  I'll return to the chair.

22      **PRESIDING COMMISSIONER BRYSON:**  Sir, did you have

23  an active restraining order in place at that time?

24      **INMATE LOVE:**  Yes, at her residence, yes.

25      **PRESIDING COMMISSIONER BRYSON:**  And what generated

1  that restraining order.  What happened?

2      INMATE LOVE:  That occurred after the stabbing.

3      PRESIDING COMMISSIONER BRYSON:  So why were you

4  violating that order?

5      INMATE LOVE:  I had forgot.  I wasn't thinking.

6      PRESIDING COMMISSIONER BRYSON:  You'd forgotten

7  about --

8      INMATE LOVE:  Yes, I had been drink--

9      PRESIDING COMMISSIONER BRYSON: -- the restraining

10  order?

11      INMATE LOVE:  Yes ma'am.  I had been drinking that

12  evening that I went over there.  I had followed the

13  restraining order prior.

14      PRESIDING COMMISSIONER BRYSON:  Sir.  Please.

15  You're a 35 year old male at that time.  You carry

16  weapons most of your adult life.  You're trying to make

17  this panel believe that you forgot that you had a

18  restraining order.  Is that really true?  You think

19  that we would believe that?

20      INMATE LOVE:  I mean we all make mistakes.  I mean

21  haven't you ever left the house and --

22      PRESIDING COMMISSIONER BRYSON:  No sir.  Just

23  answer the question.

24      INMATE LOVE:  -- forgot your purse or something?

25  Yes, I had forgot ma'am.

1    **PRESIDING COMMISSIONER BRYSON:** And I would like to
2    clarify something for the record, because I read into
3    the record the offense summary. And I have reason to
4    think that, in fact, there's an error in this. And I
5    would request both input from counsel and also the
6    district attorney. Because the offense summary reads
7    that when the police arrived, Patricia Churchill was
8    bleeding from the back of her head from a gunshot
9    wound. Indications are that the entry was the front of
10   the head. Is that correct?

11   **DEPUTY DISTRICT ATTORNEY KLINGE:** It was the right
12   forehead, entrance wound.

13   **PRESIDING COMMISSIONER BRYSON:** The right forehead.

14   **DEPUTY DISTRICT ATTORNEY KLINGE:** And the bullet
15   lodged within the head.

16   **PRESIDING COMMISSIONER BRYSON:** And the exit, there
17   was an exit wound?

18   **DEPUTY DISTRICT ATTORNEY KLINGE:** There was no exit
19   wound.

20   **PRESIDING COMMISSIONER BRYSON:** No exit wound. All
21   right. And I'd like, wanted to correct the record in
22   that regard. Was there any distance involved in
23   estimating the distance involved of that gunshot wound?

24   **DEPUTY DISTRICT ATTORNEY KLINGE:** There was no
25   stippling or anything that would indicate it was a

1    close contact wound.  Beyond that, they can't estimate

2    distance.

3        **PRESIDING COMMISSIONER BRYSON:**  Thank you.  All

4    right.  Does the district attorney have questions of

5    this inmate?

6        **DEPUTY DISTRICT ATTORNEY KLINGE:**  I do, thank you.

7    First of all, regarding the inmate's parole plans, does

8    the inmate know approximately how many properties

9    Curtis Gwinn owns?

10       **INMATE LOVE:**  No ma'am.

11       **DEPUTY DISTRICT ATTORNEY KLINGE:**  Does inmate have

12   any idea if there's enough work there to keep him

13   employed fulltime?

14       **PRESIDING COMMISSIONER BRYSON:**  Sir, do you know if

15   there's enough work to keep you employed fulltime?

16       **INMATE LOVE:**  I'm pretty sure it is, but I wasn't

17   just gone stop seeking, you know, just stop searching

18   for some work --

19       **PRESIDING COMMISSIONER BRYSON:**  Respond to the

20   panel sir.  You're supposed to be talking to the panel.

21   How do you know Mr. Guinn?

22       **INMATE LOVE:**  He's my cousin every since I've been

23   a baby.

24       **PRESIDING COMMISSIONER BRYSON:**  But I mean how do

25   you know what his situation is?  Do you communicate

1  with him frequently?  Are you --

2  **INMATE LOVE:**  Yes.

3  **PRESIDING COMMISSIONER BRYSON:**  By how?  Letters?

4  Does he come visit?

5  **INMATE LOVE:**  Letters, letters.

6  **PRESIDING COMMISSIONER BRYSON:**  All right.  Thank

7  you.  Excuse me.

8  **DEPUTY DISTRICT ATTORNEY KLINGE:**  And how old is

9  Mr. Guinn?

10  **PRESIDING COMMISSIONER BRYSON:**  How old is he sir?

11  **INMATE LOVE:**  Guinn should be in his late 70's.

12  **PRESIDING COMMISSIONER BRYSON:**  Late 70's?

13  **INMATE LOVE:**  Yes. Or early 70's, middle 70's.

14  **DEPUTY DISTRICT ATTORNEY KLINGE:**  And does the

15  inmate know if anyone else lives with Mr. Guinn at the

16  residence he's offering the inmate?

17  **INMATE LOVE:**  His wife.

18  **DEPUTY DISTRICT ATTORNEY KLINGE:**  And is it a home

19  or an apartment?

20  **INMATE LOVE:**  Home.

21  **DEPUTY DISTRICT ATTORNEY KLINGE:**  Also, the inmate

22  has stated that he was, and Mr. Guinn stated that one

23  of the interests was to the refrigeration work.  Has

24  the inmate updated his refrigeration vocation since

25  1998?

1    **INMATE LOVE:** No.

2    **DEPUTY DISTRICT ATTORNEY KLINGE:** Has the inmate

3    considered maybe doing self-study in that area to

4    update him on the things that have changed?

5    **INMATE LOVE:** I was planning on going back into my

6    labor field with my union.

7    **DEPUTY DISTRICT ATTORNEY KLINGE:** So the inmate's

8    not planning on working on the refrigeration area. Is

9    that correct?

10    **INMATE LOVE:** It's a skill that I already know.

11    And anything that need to be updated on, I will do some

12    study on. The basics I understand and know about.

13    **PRESIDING COMMISSIONER BRYSON:** And do you intend

14    to do that update through the union? Is that what

15    you're saying sir?

16    **INMATE LOVE:** Yes.

17    **DEPUTY DISTRICT ATTORNEY KLINGE:** For clarity,

18    which union exactly is the inmate current in?

19    **INMATE LOVE:** Local 324, laborers.

20    **DEPUTY DISTRICT ATTORNEY KLINGE:** Yes. The

21    Laborers' Union, so it's not any type of refrigeration

22    or heating and air union?

23    **INMATE LOVE:** No.

24    **DEPUTY DISTRICT ATTORNEY KLINGE:** The gun that was

25    used in the incident, prior to the death of the victim,

72

1  when was the last time the inmate had fired that

2  weapon?

3      INMATE LOVE:  Years.

4      DEPUTY DISTRICT ATTORNEY KLINGE:  I believe the --

5      INMATE LOVE:  I don't know for sure.

6      DEPUTY DISTRICT ATTORNEY KLINGE:  I believe the

7  inmate had stated to the police that he had fired it

8  about a month prior in a park.  Does the inmate recall

9  that?

10      INMATE LOVE:  No.

11      DEPUTY DISTRICT ATTORNEY KLINGE:  The -

12      INMATE LOVE:  Excuse me.  Commissioner?

13      PRESIDING COMMISSIONER BRYSON:  Yes.

14      INMATE LOVE:  Can I clarify what she's speaking of?

15      PRESIDING COMMISSIONER BRYSON:  Yes, please go

16  ahead.

17      INMATE LOVE:  I had stated that I had fired some

18  guns.  During a holiday season, we were shooting in the

19  park.  We were shooting some guns in the park.

20      PRESIDING COMMISSIONER BRYSON:  Was that in Oakland

21  sir?

22      INMATE LOVE:  Ma'am?

23      PRESIDING COMMISSIONER BRYSON:  Was that in

24  Oakland?

25      INMATE LOVE:  No, we was out 'round Warner (sp)

73

1  Creek.

2      **DEPUTY DISTRICT ATTORNEY KLINGE:**  So for clarity,

3  was that a different weapon the inmate was firing on

4  that holiday?

5      **PRESIDING COMMISSIONER BRYSON:**  All right.  Was it

6  a different weapon sir?

7      **INMATE LOVE:**  Yes.

8      **PRESIDING COMMISSIONER BRYSON:**  All right.

9      **DEPUTY DISTRICT ATTORNEY KLINGE:**  An approximately

10  how many different types of weapon had the inmate fired

11  during his life?

12      **INMATE LOVE:**  About six.  Can I state, can I make a

13  --

14      **PRESIDING COMMISSIONER BRYSON:**  Go ahead.

15      **INMATE LOVE:**  -- statement in regards to that?

16      **PRESIDING COMMISSIONER BRYSON:**  Yes.

17      **INMATE LOVE:**  They have all not been in the city

18  limits.  I've been back home, we, in the country we

19  shoot.  We go hunting and what-not.  So this is what

20  I'm stating the fact, you know.  I'm out with people,

21  and I'd like to try a gun, and I'd shoot it.  You know,

22  we're away from people.

23      **DEPUTY DISTRICT ATTORNEY KLINGE:**  What type of

24  hunting did the inmate partake in?

25      **INMATE LOVE:**  Rabbits.

1      **DEPUTY DISTRICT ATTORNEY KLINGE:** And has the

2  inmate ever been to a gun range?

3      **INMATE LOVE:** No.

4      **DEPUTY DISTRICT ATTORNEY KLINGE:** I believe the

5  inmate stated in 1984 he had been to the gun range.

6  Does he recall stating that?

7      **PRESIDING COMMISSIONER BRYSON:** Do you recall that

8  sir?

9      **INMATE LOVE:** No. I may have been to one in my,

10  my, somewhere, yeah, but I don't, I can't you know,

11  just right off, say I've spent a lot of time in a gun

12  range, you know.

13      **DEPUTY DISTRICT ATTORNEY KLINGE:** And when the

14  inmate was hunting rabbits, what type of weapon as he

15  using?

16      **INMATE LOVE:** Use a old shotgun.

17      **DEPUTY DISTRICT ATTORNEY KLINGE:** And the inmate

18  had responded in response to the panel's question that

19  he was not proficient in the use of guns. Maybe he

20  didn't understand the term. Based on what the inmate's

21  told us about his experience, was the inmate

22  comfortable in his handling of weapons?

23      **PRESIDING COMMISSIONER BRYSON:** How would

24  characterize that sir? Were you comfortable with

25  weapons?

*WPU, Inc.*

1    **INMATE LOVE:**   No.   I mean when you say am I, I'm

2    comfortable and what, like what?

3    **DEPUTY DISTRICT ATTORNEY KLINGE:**  Well, was the

4    inmate, felt that he was competent to go, did the

5    inmate feel he was competent to go hunting?  He was a

6    safe hunter?

7    **INMATE LOVE:**  No, I wasn't licensed to hunt.  It

8    was just like family people.  We go out in the back

9    yard.  We, you know, someone see a rabbit and they

10   shooting it, you know.  Something like that.

11   **PRESIDING COMMISSIONER BRYSON:**  So you didn't have

12   an actual license to hunt animals?

13   **INMATE LOVE:**  No, no.

14   **DEPUTY DISTRICT ATTORNEY KLINGE:**  I'm not saying

15   you have to have a license to be good with a weapon.  A

16   lot of people unfortunately hunt unlicensed.  But I'll

17   just move on.  When the inmate sign up for the anger

18   management?  He says he's on the waiting list.

19   **INMATE LOVE:**  I've taken anger management before.

20   **DEPUTY DISTRICT ATTORNEY KLINGE:**  Correct, but the

21   inmate stated here that he was on the waiting list for

22   many programs including anger management.

23   **INMATE LOVE:**  Right.  Right.

24   **DEPUTY DISTRICT ATTORNEY KLINGE:**  So when did the

25   inmate sign up for the anger management list?

1    **INMATE LOVE:** Signed up for it around 'bout a year

2    ago.

3    **DEPUTY DISTRICT ATTORNEY KLINGE:** And what other

4    classes is the inmate signed up on the waiting list

5    for?

6    **INMATE LOVE:** Stress management.

7    **DEPUTY DISTRICT ATTORNEY KLINGE:** Has the inmate

8    signed up for any groups involving victims such as

9    Vorge (sp) or any other victim-oriented groups?

10    **INMATE LOVE:** There's a list for that. I haven't

11    signed up for it though. I haven't seen the

12    supervisor, the instructor or whatever he is.

13    **DEPUTY DISTRICT ATTORNEY KLINGE:** The inmate, in

14    the past, had had parole plans with a couple of

15    different fiancées. I believe in 2001 there was a

16    Juanita Davis. Could the inmate describe that

17    relationship and what happened to it?

18    **INMATE LOVE:** She's an old friend of mine. She

19    wanted to take it into claiming fiancée. She's a good

20    friend. I just chose not to go too far into that,

21    because she has a drinking problem. And I refuse to be

22    around anybody that uses alcohol or drugs.

23    **DEPUTY DISTRICT ATTORNEY KLINGE:** And then in 2004,

24    he said he was gonna reside with Kay Johnson, his

25    fiancée. And who is that?

1      **INMATE LOVE:**  A friend.

2      **DEPUTY DISTRICT ATTORNEY KLINGE:**  And was that

3    woman his, the inmate's fiancée at the time?  That was

4    the claim in the board report.

5      **INMATE LOVE:**  Could she say that again please?

6      **PRESIDING COMMISSIONER BRYSON:**  Was she your

7    fiancée at the time?

8      **INMATE LOVE:**  A close friend ma'am.

9      **DEPUTY DISTRICT ATTORNEY KLINGE:**  It's a yes or not

10   question.

11     **INMATE LOVE:**  No.

12     **DEPUTY DISTRICT ATTORNEY KLINGE:**  And is the inmate

13   currently involved in a romantic relationship with a

14   woman?

15     **INMATE LOVE:**  No.

16     **DEPUTY DISTRICT ATTORNEY KLINGE:**  The inmate did

17   state that he had a good upbringing with his mother who

18   tried to do her best and one sister.  What can the

19   inmate point to within himself that caused him to go

20   down the path of crime as opposed to the path his

21   family was trying to lead him down?

22     **INMATE LOVE:**  Just getting around the wrong crowd

23   of people and just trying to fit in and be cool and.

24     **DEPUTY DISTRICT ATTORNEY KLINGE:**  Maybe taking it a

25   step further, can the inmate point to anything that

1   made him feel that this was the way to fit in and be

2   cool as opposed to the way his family was showing him

3   that would fit in with their lifestyle?

4       **INMATE LOVE:**  Rebellious.

5       **DEPUTY DISTRICT ATTORNEY KLINGE:**  And what in

6   particular was the inmate rebelling against?

7       **INMATE LOVE:**  Wanting to be, how would you say,

8   wanting to be, wanting to fit in and be cool, be hip,

9   instead of, I guess, what a lot of people say is just

10  being square and doing something productive with

11  themselves.

12      **DEPUTY DISTRICT ATTORNEY KLINGE:**  Was there

13  anything in particular that attracted the inmate to

14  being hip and cool in his definition, by a life of

15  crime, as opposed to being square and productive?

16      **INMATE LOVE:**  Fast money, fast women and just the

17  lifestyle, the lights, enjoying things.

18      **DEPUTY DISTRICT ATTORNEY KLINGE:**  Now the inmate

19  has stated that he and his wife had disagreements, but

20  it was never blown out of proportion.  What did he mean

21  by blown out of proportion?

22      **INMATE LOVE:**  Could she (indiscernible) say that

23  again?

24      **DEPUTY DISTRICT ATTORNEY KLINGE:**  Yes.  The inmate

25  had stated that he and his wife had had disagreements;

1    it was in response to Deputy Commissioner Harmon's

2    question, but that "it was never blown out of

3    proportion".   What did he mean by never blown out of

4    proportion?

5        **INMATE LOVE:**   What I mean by that is well we are

6    having fights and a lot of abuse in the household.

7    Arguments would occur because of my adulterous acts and

8    what-not like that.

9        **PRESIDING COMMISSIONER BRYSON:**   So you wouldn't

10    consider a fight involving a knifing, you wouldn't

11    consider that blown out of proportion?

12        **INMATE LOVE:**   Yeah, and that's out of control,

13    yeah, but nothing like that has ever occurred.

14        **DEPUTY DISTRICT ATTORNEY KLINGE:**   With his wife?

15    But I did state, in page 6 of the probation report,

16    that the inmate admitted he had "popped his wife"

17    approximately six times.   What does that mean?

18        **PRESIDING COMMISSIONER BRYSON:**   Just a moment.

19    Let's go back.

20        **DEPUTY DISTRICT ATTORNEY KLINGE:**   Okay.

21        **PRESIDING COMMISSIONER BRYSON:**   Well, the

22    restraining order was obtained by your wife.

23        **DEPUTY DISTRICT ATTORNEY KLINGE:** No.

24        **INMATE LOVE:**   No.

25        **PRESIDING COMMISSIONER BRYSON:**   Who obtained that?

1   **DEPUTY DISTRICT ATTORNEY KLINGE:**  That's not his

2   wife.

3       **INMATE LOVE:**  Patricia --

4       **DEPUTY DISTRICT ATTORNEY KLINGE:**  Was his

5   girlfriend.

6       **PRESIDING COMMISSIONER BRYSON:**  I understand.

7       **INMATE LOVE:**  -- had obtained a restraining order

8   after I, after the stabbing occurred at her house.

9       **DEPUTY DISTRICT ATTORNEY KLINGE:**  He had a wife and

10  (indiscernible-overlapping).

11      **PRESIDING COMMISSIONER BRYSON:**  Did you ever have,

12  was there ever a restraining order against you but made

13  by your wife?

14      **INMATE LOVE:**  No, never.

15      **PRESIDING COMMISSIONER BRYSON:**  All right, thank

16  you.  Go ahead.  I'm sorry.

17      **DEPUTY DISTRICT ATTORNEY KLINGE:**  A little

18  confusing, 'cause there were two women.

19      **PRESIDING COMMISSIONER BRYSON:**  Yes.

20      **DEPUTY DISTRICT ATTORNEY KLINGE:**  -- at the same

21  time.  So my question is when he stated that he had

22  popped his wife approximately six times, what does that

23  mean?

24      **INMATE LOVE:**  I have, I slapped her.  That's a pop.

25      **DEPUTY DISTRICT ATTORNEY KLINGE:**  And then that's

1   not something that he would consider blown out of

2   proportion?

3      **UNIDENTIFIED FEMALE SPEAKER**: You have to talk to

4   them.

5      **INMATE LOVE**:  No.

6      **DEPUTY DISTRICT ATTORNEY KLINGE**:  Also, in that

7   same paragraph, he described himself as being quiet and

8   jolly when he drinks.  Looking back, is that how he

9   would now describe himself when he drank back then,

10  quiet and jolly?

11     **INMATE LOVE**:  Sometimes, and sometimes I would have

12  an attitude problem, yes.

13     **DEPUTY DISTRICT ATTORNEY KLINGE**:  Now regarding the

14  victim of this crime, Patricia, did the inmate also

15  "pop" her in the past, before the incident?

16     **INMATE LOVE**:  Yes.

17     **DEPUTY DISTRICT ATTORNEY KLINGE**:  And did the

18  inmate burn Patricia's throat with a cut cocaine pipe

19  at one time leaving permanent scars?

20     **INMATE LOVE**:  No.  May I speak on that?

21     **PRESIDING COMMISSIONER BRYSON**:  Go ahead.

22     **INMATE LOVE**:  One night Patricia was laying in the

23  bed.  We was drinking.  We was having a little fun in

24  the bedroom, and the pipe slipped out her mouth, and it

25  fell on her neck, and she burnt the damp (ph) of her

1    neck like that.  That's what happened ma'am.

2        **DEPUTY DISTRICT ATTORNEY KLINGE:**  Did the inmate

3    ever slap Patricia in the head with a spray can of

4    starch?

5        **INMATE LOVE:**  No.

6        **DEPUTY DISTRICT ATTORNEY KLINGE:**  Did the inmate

7    ever choke her?

8        **INMATE LOVE:**  No.

9        **DEPUTY DISTRICT ATTORNEY KLINGE:**  Did the inmate

10   cause the bruises on her face and eyes from an incident

11   occurring on September 1st of 1989?

12       **INMATE LOVE:**  I can't re--, no.

13       **DEPUTY DISTRICT ATTORNEY KLINGE:**  Did the inmate

14   ever cause bruises to Patricia's face?

15       **INMATE LOVE:**  No.  She had a pretty face.  I would,

16   never was trying to destroy that woman.

17       **DEPUTY DISTRICT ATTORNEY KLINGE:**  But when the

18   inmate popped Patricia, where did he pop her?

19       **INMATE LOVE:**  The side of her face.

20       **DEPUTY DISTRICT ATTORNEY KLINGE:**  The side of her

21   face?

22       **INMATE LOVE:**  Yes.

23       **DEPUTY DISTRICT ATTORNEY KLINGE:**  And when the

24   inmate had said to Deputy Commissioner Harmon, that he

25   and Patricia "had had our disturbances", is that what

 1 | he was referring to?

 2 | **INMATE LOVE:** Yes.

 3 | **DEPUTY DISTRICT ATTORNEY KLINGE:** If I may just
 4 | have a minute, thank you.

 5 | **PRESIDING COMMISSIONER BRYSON:** Yes.

 6 | **DEPUTY DISTRICT ATTORNEY KLINGE:** The inmate stated
 7 | that he drank approximately three to four half-pints of
 8 | gin a day prior to the murder, but on page eleven of
 9 | the probation report, he had said "he was drinking
10 | three to four cans of malt liquor per day.

11 | **INMATE LOVE:** Excuse me, Commissioner. Could

12 | **PRESIDING COMMISSIONER BRYSON:** Sir?

13 | **INMATE LOVE:** You had asked me how often and how
14 | much would I drink?

15 | **PRESIDING COMMISSIONER BRYSON:** Mmm-hmm.

16 | **PRESIDING COMMISSIONER BRYSON:** The evening of the
17 | incident, I had been drinking beer.

18 | **PRESIDING COMMISSIONER BRYSON:** Right.

19 | **INMATE LOVE:** So I'm just trying clear what she's
20 | speaking of.

21 | **PRESIDING COMMISSIONER BRYSON:** Okay.

22 | **DEPUTY DISTRICT ATTORNEY KLINGE:** And that's fine,
23 | 'cause the sentence had just been typed as he states
24 | that prior to (indiscernible-coughing) this matter, he
25 | was drinking three to four cans of malt liquor per day,

1 | which would lead me to believe it was more than just
2 | particular day.  I have nothing further.

3 | **PRESIDING COMMISSIONER BRYSON:**  Sir, you talked
4 | about, you know, one of the things you did with guns
5 | was go out and, as a lot of people do, and you hunted
6 | rabbits and stuff.  You did that, right --

7 | **INMATE LOVE:**  Yes.

8 | **PRESIDING COMMISSIONER BRYSON:**  -- you said?  Okay.
9 | Sir, did you shoot some?

10 | **INMATE LOVE:**  No.

11 | **PRESIDING COMMISSIONER BRYSON:**  You didn't shoot
12 | any?

13 | **INMATE LOVE:**  No.  I was with people that had done
14 | it, but my shooting wasn't that good.

15 | **PRESIDING COMMISSIONER BRYSON:**  Okay.  My question
16 | sir to you is, you knew that guns kill, don't you?

17 | **INMATE LOVE:**  Yes ma'am.

18 | **PRESIDING COMMISSIONER BRYSON:**  And you knew that
19 | then, right?

20 | **INMATE LOVE:**  Yes.

21 | **PRESIDING COMMISSIONER BRYSON:**  Do you expect this
22 | panel to believe sir that shooting in the direction of
23 | someone would not potentially them?

24 | **INMATE LOVE:**  No, I wouldn't want you to believe
25 | that.  I made a bad decision, and I wasn't thinking,

1  but I would want the panel to believe that it was not

2  intentional.

3  **PRESIDING COMMISSIONER BRYSON:**  Is that what you

4  believe sir?

5  **INMATE LOVE:**  Yes.

6  **PRESIDING COMMISSIONER BRYSON:**  All right.

7  Counsel, do you have any questions of the inmate?

8  **ATTORNEY DAVEY:**  I don't have questions of my

9  client.

10  **PRESIDING COMMISSIONER BRYSON:**  All right, then I

11  would like to invite the district attorney to make

12  closing statement.

13  **DEPUTY DISTRICT ATTORNEY KLINGE:**  Thank you.  The

14  Alam-, I'm not being rude to the inmate.  I have to

15  look at the panel.  The Alameda County District

16  Attorney's Office is opposed to parole at this time and

17  does believe that the inmate is unsuitable and would

18  pose a danger if released at this time.  This is gonna

19  be based on several factors.

20  The commitment offense, while the inmate exercised

21  his right to not discuss the facts, I find that

22  unfortunate because in my review of the transcripts,

23  and the statements throughout history, the panel's now

24  left with some questions that haven't been resolved;

25  which leaves the panel in a position where it's hard,

1   if you haven't resolved what happened, the inmate in my

2   opinion has not demonstrated true remorse and insight

3   and delved deep enough into all the causative factors

4   and what really happened that day.

5       If you look at the life crime, the inmate has

6   consistently called it as he discussed, and perhaps

7   it's somewhat semantics, accident, mistake, bad

8   judgment, which is certainly was bad judgment.  But in

9   this incident, the inmate as he stated and has stated

10   consistently for example in 2001, on page ten of the

11   transcript, that the night of the incident, strike

12   that.

13       He kinda differs.  Sometimes he says she called

14   him, but then it consistently also says he called her,

15   and the victim's son, Patricia's son said that the

16   inmate called the residence.  So from the evidence I

17   can see, the inmate called Patricia.  There was a

18   restraining order.  He claims he forgot there was one.

19   More likely, he was just ignoring it, because they were

20   off and on, still having contact.

21       But he violated the restraining order by calling

22   Patricia.  He wanted to go over and get some belongings

23   is what he's saying.  Obviously whatever happened

24   before he got there upset her; because he says when he

25   got there, she immediately opened the door, threw



1   things at him and was angry. This was a volatile

2   relationship that had been going on for years.  There

3   was a restraining order that was filed that laid out

4   numerous assaults the inmate had done on Patricia.

5       There was serious domestic violence issues.  The

6   neighbors had heard them arguing that night.  He claims

7   in different places that he slipped down the stairs,

8   when he was speaking on page 7 of the probation

9   officer's report.  They're delineating what he said to

10  the police.  He said, "I slipped down the stairs. I got

11  up and started walking, and she was still hollering.";

12  which would indicate that she was still outside her

13  door.

14      "I had been drinking quite a bit that day."  This

15  is an apartment where you walk out the door, and you

16  come to a little landing and you turn right and go down

17  a set of wooden stairs.  He gets there.  She's angry

18  for whatever had happened on the telephone probably.

19  She comes out.  He first says he slipped down the

20  stairs.  Now over the years, he's now saying she pushed

21  him down the stairs.  Then he says that at one point

22  she was still hollering at him.  Now he says she was

23  peeping out the door.  Even if she was peeping out the

24  door, his statement that she was peeping out the door

25  means he could see her peeping out the door and know

1  she was there.

2      But then he says, I didn't know she was there.  I

3  just fired out of anger up the stairs.  Yet he hit her

4  in the right forehead a little bit to the right, the

5  bullet going from front to back, a 30 degree angle from

6  right to left and a 5 degree angle up.  Shooting from

7  down an entire flight of stairs, it's against most odds

8  that you would be able to hit someone with a single

9  shot; and I believe he shot more than once, maybe

10  twice, but out of two shots that you would be able to

11  hit someone that square in the forehead.

12      And the inmate today didn't speak about the life

13  crime.  I'd like to know how was he standing when he

14  shot the victim?  Where was he facing?  He claims this

15  was a shooting in the air out of anger.  It's

16  incredulous to me with his experience with weapons, at

17  least six different weapons, firing in parks, firing at

18  rabbits, being a security guard; he knew when you pull

19  a trigger of a gun, a bullet comes out and that things

20  die.

21      True, he was probably angry. True, he was probably

22  drinking.  But he went there with a gun to confront a

23  woman that he had a volatile relationship with, and he

24  shot her, killing her by hitting her I the forehead.

25  And did he go up to see if she was injured?  No. Her

1    body was found on the stairs outside her doorway about
2    two feet from the doorway. He didn't go back to see if
3    she was injured. You can't tell me he didn't look back
4    and see her laying there. He just left.

5        Her son was home at the time. I think he was ten
6    at the time. You know the victim didn't live a perfect
7    life. There was evidence that she had some cocaine
8    metabolite in her system, which is evidence of past
9    use, but not current use at that time on that day. She
10   was pregnant. The fetus died also. This is clearly an
11   atrocious heinous crime, and it was carried out in a,
12   and I would say, a calculated manner. He had a weapon
13   with him. He pulled it out. He aimed it and fired it,
14   and he left.

15       That home was occupied by other people. He knew
16   she had a son, and he's firing up at that doorway.
17   Other people could have been hurt. The motive for the
18   crime, anger, volatile relationship, certainly very
19   trivial. He did have a somewhat extensive criminal
20   history. He did fail from society's profits to change
21   his behavior with county jail, probations. He had a
22   serious drinking problem. He had a lot of DUI's. He
23   had weapons when he was drunk in past as evidenced by
24   the 417 and the driving under the influence.

25       I would say has programmed in a limited manner

 1  here.  I would commend him.  He has done some programs

 2  in '05, relationship awareness, stress management.  He

 3  has stepped up in his AA recently.  He claims he's been

 4  in since '93 or '94, but I can only find some chronos

 5  in 2000 and then 2006 and on.  He had some dabbling in

 6  programs in '96 and '97, then jumps to 2000 for the

 7  five, he did five steps out of 12 on the AA.  And then

 8  in '05 he gets some programming going on.  It's limited

 9  programming compared to the amount of time he's been

10  down.

11       He clearly has issues with domestic violence and

12  women.  It was marginally address in the recent

13  psychological report.  Dr. Starrett does have a

14  tendency to say, well, these kinds of counseling aren't

15  available in the system, so there's nothing we can do.

16  Let's throw our hands up.  But, and then gives him a

17  low risk.  I find it incredulous that he gives him a

18  low risk if he truly revealed the inmate's pattern with

19  women.

20       Popping your wife, slapping your wife, slapping

21  your girlfriend, the allegations that led to the

22  restraining order, the bruising, the neighbors saying

23  that there was a lot of arguments; even the numerous

24  claims of fiancées and relationships with women, is a

25  pattern of a problem of anger and control especially

1   with women.  Now the inmate did state that he knows he
2   needs to deal with that.  He certainly does.  And if he
3   can't get in the programs within the institution, there
4   is self-study he can do, books he can read.  You know,
5   things he can do himself to try to deal with that
6   issue.

7        Comparing forgetting a purse to forgetting a
8   restraining order is ridiculous.  I found that
9   statement ridiculous and also the, it's very telling
10  that he and Patricia had "disturbances".  Disturbances
11  are maybe an argument, you know, something like that,
12  not a physical fight.  He had his wife had
13  disagreements, but it was not blown out of proportion;
14  but yet he would slap his wife.  Shooting a door just
15  to scare her.  That just doesn't ring true or make
16  sense.

17       The inmate truly lacks insight I believe into his
18  causative factors, his patterns of life.  He has shown
19  some progress in that.  He knows he went for the fast
20  women and fact cars.  He knows that he wants to not be
21  like that anymore.  But the panel doesn't have enough
22  to rely on to feel comfortable that he would be safe if
23  released into society at this time.

24       The psychiatric report in 2004 gave him a moderate
25  risk, but the current one gives him a low risk.  The

1    '94 psych report, as stated, claimed his insight into

2    the crime involvement and situation appears in tact,

3    but it doesn't give what it's based on.  That's a

4    paragraph that I've seen repeatedly rubber-stamped in

5    these report, but it doesn't into what is that based

6    on.  What did the psychologist see that he could base

7    that on?

8         The parole plans need to be firmed up.  He needs a

9    little more information on the rental properties, the

10    living arrangement, what he'd be doing when he's out

11    there.  For being in touch with his cousin Curtis Guinn

12    for this length of time he had, there's a lot of

13    information that seems to be missing that he could

14    bring to the table that would firm those up.

15         And with that I would submit that the inmate needs

16    a multi-year denial to give him time to get the

17    programming, get the insight and work on the things

18    that he can add to what he's already done, to give the

19    panel more assurances that he's ready to be released

20    into society.  Thank you.

21         **PRESIDING COMMISSIONER BRYSON:**  Thank you.  And

22    counselor, I'd like to invite you to make a closing

23    statement.

24         **ATTORNEY DAVEY:**  Yes, Commissioner.  Thank you.

25    First off, with due respect to the family that's

1   present, my client does submit to the panel that he is
2   suitable for parole at this point in time.  This is
3   based on several factors, not the least of which is the
4   fact that he's spent approximately 16 years in custody
5   on a second degree murder that he pled no contest to to
6   prevent the necessity of this family of this young
7   lady, Patricia Churchill, to have to go through a trial
8   proceedings.  He did step up to the plate, admit and
9   took the plea.

10      The facts of the case are probably unknown to
11  anybody but my client.  He was the only one who was
12  there.  He's elected not to discuss it today, and that
13  is his right.  And that should not be held against him.
14  But nonetheless, he's taken full responsibility for the
15  crime, and that is documented in the file
16  notwithstanding what was objected to later in my
17  opening statement.

18      My client has had, and has been described in the
19  record as, a criminal history.  He admits that.  There
20  were some fights.  There was some use of alcohol which
21  was improper which resulted in three or four DUI's
22  prior to the life crime.  He admits that he was
23  drinking.  He admits that he was basically a happy
24  drunk at some point and a agitated one at others, I
25  think in response to one of the questions that was

1  asked of him.

2      He has been clean and sober the full time he's been

3  custody. He has ingrained himself in the 12 step

4  program attempting to work those steps and believes

5  that the program is viable to him and will keep him

6  clean and sober. And certainly the life crime resulted

7  from an impairment due to alcohol by his own admission,

8  by the record and by past history.

9      My client comes from a good home. He admits that

10  he had good upbringing. His mother and his family did

11  not raise him to drink, did not raise him to "abuse

12  women" or that sort of thing. He, by his own

13  admission, he got in with the wrong crowd, his term to

14  the DA was fast women, fast cars, booze, whatever was

15  going on at the time. Seemed like a more effective way

16  to spend time.

17      But on the other side, I would note that he did,

18  after he dropped out of high school, he did finish his

19  high school accreditation with a GED. Prior to coming

20  into custody, he worked in several jobs, one of which I

21  think was approximately 10 or 12 years long. And he is

22  a member of a local union in the Bay area, Laborers'

23  Union. So he does have skills that he's learned in

24  custody. He's got air conditioning and refrigeration

25  skills which he's learned. He's also got, I believe

1  one other trade here, one moment --

2      **DEPUTY COMMISSIONER HARMON:**  Janitorial.

3      **ATTORNEY DAVEY:**  Right, and he's currently involved

4  in spray painting for metal fab industries at this

5  point and very experienced in that area.  So he does

6  have job skills that he's learned since he's been in

7  custody; two vocations earned and with job experience

8  in other areas.

9      My client is not afraid to work.  He's worked the

10  full time he's been in custody pretty much.  He's

11  getting good work reports, average and above average

12  work reports from his supervisors.  Self-help.  He's

13  completed, well, it may be not enough.  I don't know

14  what enough is, but in some panels the enough is more

15  than one, less than 300 courses.

16      My client does spend his time actively pursuing his

17  bible studies, basic reading.  He described some of the

18  books he's been reading in the past relating to black

19  history, and individuals in that arena, which are

20  considered self-help as well, as part of your

21  genealogy.  He has signed up for other classes that are

22  available in further attempting to provide the panel

23  with additional information that he is participating in

24  self, including anger management, stress management and

25  I believe there's a couple of others he signed up but

1   he couldn't recall which ones they were.  Some of the
2   classes here have a long wait list.  And, you know,
3   some of the inmates that I've talked to says it depends
4   on the yard, it depends on the building, which name
5   comes up first.

6       The facts of the file speak for themself.  My
7   client did have a colorful history coming into custody,
8   but at this point he's got no disciplinary history
9   whatsoever in prison.  If he can behave for almost 16
10  years without a write-up in custody in a state penal
11  institution, I think speaks volumes for anger control,
12  stress management, other issues that could technically
13  be covered in a class.  But it does prove that my
14  client can get along in a stressful environment which
15  he's done for that period of time.

16      He does have parole plans.  He's got a cousin out
17  there who's gonna give him a residence, give him a job.
18  It may not be his specific choice to work for his
19  cousin fulltime.  As he indicates, he is not gonna sit
20  on his laurels. If his cousin can't keep him busy
21  fulltime, he's willing to work for other jobs including
22  reestablishing himself in the union which he previously
23  was a member of.

24       So where does that bring us?  It brings us to the
25  psychological evaluations.  You know, it's always the

*WPU, Inc.*

1  battle of the shrinks, whether it be in trial, whether

2  it be in one of these type of hearings or otherwise.

3  The board has to determine risk in the community before

4  they can make a decision whether a particular inmate is

5  suitable for parole or not.  And most of the emphasis

6  that the board generally uses is in the psychological

7  evaluations of the particular inmate.

8      In my case, in Mr. Love's case, he's participated

9  in several psychological evaluations during his time in

10 custody. Most recent ones have been for the board.  I

11 think (indiscernible-background noise) when he first

12 came in.  But if you take the good, the bad and the

13 indifferent with all of them, you'll find that most of

14 the evaluators, including the most recent evaluator,

15 have noted that he would be in a low risk assessment if

16 released in the community.

17     The district attorney would have you believe that

18 the psychologists are all nuts, but that's typical.

19 Like I said, even at trial it's the battle of the

20 psychologists.  You get one guy saying one thing, you

21 get the defense counsel's psychologists saying

22 something totally different, and then the judge or jury

23 has to determine who's on first and what's gonna

24 happen.

25     But the most recent evaluation has been

98

1    accomplished using the new tools that are being

2    recommended and being required by the board, including

3    but not limited to the tools stated in Dr. Starrett's

4    most recent report of 11/5/07.  The risk assessment in

5    this case appears to be low in every category except

6    the historical.  Bottom of page six, and it states the

7    reason that he would be at a moderate range for future

8    violence rating is based on his age at the time of

9    first violence, past arrest history, being involved in

10    an unstable relationship, substance abuser, being on

11    prior supervision and, to a lesser extent, not

12    establishing a career.

13        That all occurred before my client came into

14    custody.  So Dr. Starrett rates him at a moderate range

15    in that tool; but every other tool, including clinical

16    insight, is rated as a low range of risk.  Risk

17    management is low.  The propensity for future violence

18    is low.  The recidivism risk is low, and general

19    overall risk assessment, as read in the record by

20    Commissioner Harmon, is the inmate's level of

21    psychopathy is in the low range.  Even his overall

22    propensity for violence is in the low range compared to

23    similar inmates, and the inmate's general recidivism

24    risk is rated in the low range.

25        You know, if he had three more psychological

1    evaluations on the table, I think they would all come

2    to the same bottomline conclusion.  Obviously, the Axis

3    I consideration plays into the panel's decision as well

4    That's the alcohol abuse in the past which is in

5    sustained institutional remission.

6        My client doesn't have any pruno write-ups.  He

7    doesn't have any write-ups of any kind.  By his own

8    admission, he says I don't wanna drink anymore.  I've

9    seen what it can do.  I've seen it in my past criminal

10   history, and I've seen it in the life crime.  I believe

11   that the questions posed by Commissioner Harmon are

12   right on point.  My client is a person that takes the

13   Alcoholics Anonymous program seriously.  I believe he

14   has participated in it, whether it's documented or not

15   for the period of time he states.  He's a believer in

16   it.  He's able to discuss the steps.  He worked some of

17   the steps on a day-to-day basis.

18       And my client is committed to continuing the

19   program in the community.  My client does have the

20   support.  He's got the plans.  He's got a disciplinary-

21   free record coming into this hearing.  He's been before

22   the panel on two prior occasions, and at this point in

23   time Mr. Love should be found suitable for parole.

24   Thank you.

25       **PRESIDING COMMISSIONER BRYSON:**    Thank you counsel.

1   Sir, are you suitable for parole?

2       **INMATE LOVE:**  Am I?

3       **PRESIDING COMMISSIONER BRYSON:**  Yes, are you?

4       **INMATE LOVE:**  Yes, I believe I am now.

5       **PRESIDING COMMISSIONER BRYSON:**  Why?

6       **INMATE LOVE:**  I acknowledge that I made a terrible

7   mistake, quite a few in my life.  And I've come to

8   grips with the fact that there needed to be a change in

9   my life.  I've done a lot of things to better myself.

10  A lot of people wouldn't believe it, but I have.  I

11  have some feasible and marketable skills that I can use

12  in society and going and continue to better myself as a

13  person.

14      I acknowledge that I should have been punished, and

15  I have been punished for my wrongs in this crime here.

16  And the greatest punishment that I feel could come out

17  of this was me opening my eyes to the fact that, you

18  know, I took someone's life, and I'm sorry it happened.

19  You know, I acknowledge my wrongs.  I'm willing to go

20  out in society and try to work with others in getting

21  themselves together and even taking up a few little

22  courses of going to some of the programs that deals

23  with the abuse that women go through, getting a better

24  understanding that what they encounter.

25      So, you know, it's not like I'm in closed mind to

1   the pain that others suffer. And, you know, it's
2   always on my mind of what occurred. You know, it's not
3   like it's water under the bridge or nothing. I think
4   about it. I'm not pleased with the choices I've made,
5   and I'm truly sorry about it. You know, and at this
6   time, speaking to the victim's family and friend, I
7   know both of you have a bitter taste in your mouth
8   about me; but from a spiritual perspective --

9       **PRESIDING COMMISSIONER BRYSON:** Sir this is, excuse
10  me, but this is not your time to speak to the victim's
11  next of kin. This is your time to describe why you're
12  suitable for parole sir.

13      **INMATE LOVE:** Well, I'm just opening my eyes and
14  acknowledging that, you know, I can make a difference
15  in society, least in my community as a person you know.
16  I have some skills that I would like to get out there
17  and use. I enjoy my painting skills whether they be
18  industrial or for, as homes and what-not you know. I
19  can sell myself out there. From behind these walls it
20  is hard for me to reach out and communicate with people
21  or even deal with a interview.

22      You know, it's hard to get somebody to say they
23  gone hire you for a skill when you in here, when they
24  would like to see face-to-face you know. I do have
25  some that I do enjoying doing, painting is one, whether

1   it be car bodies which I'm working with up there with

2   CalTran, painting all they trucks and stuff.  We build

3   they stuff up there, you know.  We make everything

4   that's on the road out there, you know, the dump

5   trucks, the cone trucks, litter trucks and all that.

6   We're making that up there, so my skills is in tact, my

7   welding and everything.  And I just got to get out

8   there where I can sell myself, you know.

9       **PRESIDING COMMISSIONER BRYSON:**  Okay sir.  Thank

10  you for your remarks.  And now, according to Penal Code

11  Section 3043b, victim's next of kin have the right to

12  adequately and reasonably express your views concerning

13  the crime and the person responsible.

14      **DEANNA CHURCHILL:**  Well --

15      **PRESIDING COMMISSIONER BRYSON:**  Excuse me, please

16  identify yourself again.

17      **DEANNA CHURCHILL:**  My name is Deanna Churchill.

18  I'm Patricia's sister.  Just to give you a brief

19  history, when Patty first met the inmate, from the

20  beginning he terrorized my sister.  He beat my sister.

21  He stalked my sister.  He burned my sister.  He choked

22  my sister.  In my apartment building, I had to hit him

23  to get him off my sister.  He choked her 'til she

24  almost was not breathing.  He threw my sister from her

25  second story apartment building over the banister onto

103

1   the concrete like she was a dog.

2      It was to the point when he was incarcerated, he

3   had someone watching my sister's house, and she didn't

4   even wanna go home.  Just from the day one, he's just

5   be a terrorist and a menace to our family.  It was at

6   six months at a time, we didn't even know where my

7   sister was, because he wanted her to just stay, you

8   know, under his confines.  And I just, you know, I

9   don't feel that he's remorseful for what he's done,

10  just by his body language, the look in his eyes.  I

11  just don't see it.

12     And, you know, it's just really caused, just

13  emotional, just really caused emotionally trauma to my

14  family.  As you see, her son is not even here today,

15  'cause he can't deal with it.  You know, he doesn't

16  talk about it.  It's just, you know, it's just too

17  much, you know, for one person to deal with.  And I

18  believe, you know, that it was a premeditation, and I

19  believe that he was jealous because of the fact that my

20  sister pregnant, and it was not his child.

21     And I just get a sense of arrogance from him.

22     **PRESIDING COMMISSIONER BRYSON:**  Take your time.

23     **DEANNA CHURCHILL:**  Yeah.  It's a lot.  You know,

24  and there was a lot, you know, on my mind.  So I put

25  that in, you know, part of that in my closing

1    statement, but it's just been a whole lot on our whole
2    family.   I mean, my mother wasn't even able to attend
3    the service to bury my sister.  We had two funerals.  I
4    had to attend two funerals for my sister.  That's a lot
5    for one person.

6        It affects our relationships.  I have two
7    daughters.  They don't know my sister.  My grandkids
8    won't never know my sister.  It affects our
9    relationships with men in our lives and people in our
10   lives and people in our lives.  If my kids are ten
11   minutes late coming home, I'm scared to death.  And
12   it's just traumatized me since 1990, and our whole
13   family, all our friends.

14       This is my sister's best friend.  They went to
15   kindergarten together, and we just never, will never
16   ever forget you know.  And I'm the one that saw her
17   like that you know.  My mom couldn't even go in the
18   room.  And it's just traumatizing to us.

19       And so this is something I typed up this morning.
20   And I just said that, on behalf of our family it is our
21   heartfelt wish that inmate Love not be released.  We
22   feel deeply that this was not an accident, nor a crime
23   of passion.  This was indeed a calculated and thought,
24   it was calculated and thought out.  He has taken from
25   our family, not only our sister, but my unborn niece.

*WPU, Inc.*

1  Neither of them had a chance to live life.  We want him
2  to never be released.

3     Our society needs to be free of person of his
4  character that has no regard for human life.  Our
5  family has been so deeply affected by this.  If she was
6  nothing to you, she meant a lot to us, and we miss her
7  everyday.  We have lost so much behind this.  Mother's
8  Day weekend will never be the same for us, which is
9  also my birthday weekend.  My family had to live
10 without our daughter, mother, sister, auntie.  I'm
11 still just as much in disbelief as I was the day she
12 was senselessly murdered; I mean in a state of shock.

13     My nephew, who is now 28, lost his mother at a
14 tender age of 10 years old.  Wow.  They were both
15 robbed of his growth into a fine young man that·she
16 would be proud of.  My sister was murdered just two
17 weeks after my mother had artery blockage surgery.  She
18 was forced to deal with the stress of losing her oldest
19 daughter and having to raise her grandson when she
20 should have been able to enjoy her life and take care
21 of herself which I think contributed to her early
22 passing.

23     This has caused an undue stress on our family.  My
24 daughters have never had a chance to grow up with their
25 aunt or their unborn cousin.  She was cut short, and

1   it's not fair.  She's missing her son's, she missed her

2   son's graduation, and she'll never get a chance to hear

3   his music gift.  She'll miss his wedding in May, and

4   she'll never meet her daughter-in-law.  We are angry,

5   we're hurt, we're shocked, and we're just empty.

6       We plead with the board not to release him for this

7   would be no justice on our part.  We feel he should pay

8   the rest of his life, as we will suffer as well.  Yeah

9   and, you know, so the abuse was so much to the point

10  where my sister retired from her job.  She worked for

11  the telephone company for ten years, and she was

12  retiring from her job.  And it was at points in time

13  where he would like just take my sister's whole

14  paycheck from her to buy drugs and alcohol.

15      And my sister had three hundred and something

16  dollars in her purse and her train ticket, because she

17  was leaving town and moving back to Georgia.  She had

18  secured employment with Southern Bell, and he touched

19  none of that.  And when you talk to a person on the

20  phone, you catch the bus to their house after ten

21  o'clock at night, when the buses are running every

22  thirty minutes.  You'd have time to stand at the bus

23  stop and think.  You had three blocks to walk to her

24  house.  You walked up her stairs.  You pulled your gun

25  from wherever.  You had time.  You went there with the

1  intentions on harming my sister.  That's what I

2  believe.  That's what I really believe.  Yeah, and he

3  did threaten her before.  Most definitely.

4      **PRESIDING COMMISSIONER BRYSON:**  Thank you.

5      **DEANNA CHURCHILL:**  Okay, thank you.

6      **PRESIDING COMMISSIONER BRYSON:**  And you did not

7  wish to speak?  Is that correct?

8      **DONNA SPRIGGS:**  No.

9      **PRESIDING COMMISSIONER BRYSON:**  All right, thank

10 you.  All right.  We're going to recess now for

11 deliberations, and the time is 11:02.

12

13                    (Recording stopped)

14                    **R E C E S S**

15                      --o0o—

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**CALIFORNIA BOARD OF PAROLE HEARINGS**

**D E C I S I O N**

**DEPUTY COMMISSIONER HARMON:** You're on record.

**PRESIDING COMMISSIONER BRYSON:** Thank you, and we've reconvened in the matter of Aubrey Love. And the time is now 11:40. All parties have returned to the room. Sir, this panel reviewed all information received from the public and relied on the following circumstances in concluding that you're not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison.

This offense was carried out especially cruelly and callously, in that on May 8th 1990, the victim, Patricia Churchill, a 33 year female and her unborn fetus were particularly vulnerable, as she was unarmed, 16-20 weeks pregnant. And the inmate enjoyed a special position of trust and confidence with her despite their history of domestic violence. On November 11th of 1989 the victim had filed a domestic violence charge against the inmate. A witness said she heard sounds of fighting earlier in the evening of the victim's death. The inmate has given multiple versions of the offense. When the police arrived at the victim's residence,

**AUBREY LOVE    H-26500    DECISION PAGE 1    11/08/07**

*WPU, Inc.*

1   she was bleeding from her head from a gunshot wound.

2   None of the neighbors heard anything, but they all

3   identified the inmate as her husband.  Witnesses

4   reported they fought often.  The offense was carried

5   out in a dispassionate and calculated manner.  This

6   victim was taken to the hospital and placed on life

7   support in an attempt to save the life of the fetus,

8   but she was finally taken off life support after

9   doctors determined the fetus was not viable.

10      This inmate claims to have stable family upbringing

11  and relationships.  He is a heavy drinker by history

12  and has said so here in this hearing today.  In fact,

13  he testified today that at the time of the crime he was

14  consuming approximately two to four one half pints of

15  gin per day.

16      This inmate's history shows previous violence,

17  assaults and prior criminality that shows an escalating

18  pattern of criminal conduct.  This inmate has failed

19  society previous attempts to correct his criminality,

20  including adult probation and time in the county jail

21  for crimes including assault and battery, burglary,

22  reckless driving, theft and multiple DUI's, and firearm

23  offenses.

24      As to institutional behavior, this inmate has had

25  **AUBREY LOVE     H-26500     DECISION PAGE 2     11/08/07**

1    limited programming.  He currently is in PIA metal fab

2    and working as a PIA painter and sprayer in which he

3    achieved a certification as a painter sprayer I in 2007

4    in which he served over 1500 hours.  And he's been

5    receiving above average work reports.  He also has

6    worked in metal fab as a welder.  In the past he's been

7    a building porter and worked in recycling and clothing,

8    and he appears to be a good worker.

9        This inmate achieved his GED outside the prison

10   system and has not upgraded since.  He has also

11   achieved vocational air conditioning and refrigeration

12   and vocational janitorial.  This inmate has had limited

13   self-help and therapy.  He has participated in AA as

14   various times from 1993 until 2007, yet he had some

15   difficulty in recall of the 12 steps.  This inmate, in

16   2005, a relationship awareness workshop involving

17   stress management.  And previous to that, in 2000

18   substance abuse program, and previous to that in 1997

19   men's violence prevention.

20       This inmate is to be commended for having zero

21   115's, and we don't see that very often sir; and zero

22   128a's as well.  So you're to be commended for that.

23   And so you've displayed positive behavior from a

24   disciplinary standpoint.  As to the psychological

25   **AUBREY LOVE    H-26500    DECISION PAGE 3    11/08/07**

1  report, dated October 25th 2007 by Dr. Richard Starrett,

2  Dr. Starrett assigns this inmate with a high global

3  assessment functioning of 90.  He also diagnoses him

4  with alcohol dependence in controlled environment

5  remission and adult antisocial behavior.

6       In assessing his risk for future violence, and

7  using various instruments, the clinician placed this

8  inmate in the low range, compared to similar inmates,

9  and the inmate's general recidivism risk as rated in

10  the low range.  And I shall return to this clinician's

11  report in a moment.

12       As to parole plans, this inmate has documented

13  parole plans via a letter from his cousin Curtis and

14  Janet Guinn, G-U-I-N-N, as to residence and apparently

15  a part-time job with Mr. Guinn's rental properties.

16  And the inmate asserts that he would be paid to do

17  basic painting and other general repair services in

18  those rental properties.

19       So this panel finds that the inmate's parole plans

20  are not comprehensive, and they're not robust.  They

21  need to be made more robust and more certain.  As to

22  this inmate' marketable skills, he does appear to have

23  marketable skills, although he has not updated his air

24  conditioning and refrigeration, but he also is a member

25  **AUBREY LOVE    H-26500    DECISION PAGE 4    11/08/07**

1   of the Labor International Union of North American

2   Local 324, and he does have welding and painting skills

3   which would be very marketable on the outside.

4       As to penal code 3042, responses indicate

5   opposition to finding of parole suitability,

6   specifically by the District Attorney of Alameda

7   County.  In a separate decision, the hearing panel

8   finds it is not reasonable to expect that parole would

9   be granted at a hearing during the following three

10  years.  Specific reasons for this finding are as

11  follows:

12      First, this offense was carried out in an

13  especially cruel and callous manner, in that on May 8th

14  1990, the victim Patricia Churchill, 33 year female

15  with a live fetus was particularly vulnerable, as she

16  was unarmed and 16 to 20 weeks pregnant.  The inmate

17  enjoyed a special position of trust and confidence with

18  her despite their history of domestic violence.  On

19  November 11th 1989 the victim had filed a domestic

20  violence charge against the inmate.  A witness said she

21  heard sounds of fighting earlier in the evening of the

22  victim's death.  This inmate has given multiple

23  versions of the offense.

24      When police arrived at the victim's residence, she

25  **AUBREY LOVE    H-26500   DECISION PAGE 5    11/08/07**

1  was bleeding from her head from a gunshot wound.  None

2  of the neighbors said they heard anything, but they all

3  identified the inmate as her husband.  The witnesses

4  reported they fought often.  This offense was carried

5  out dispassionately and in a calculated manner.  This

6  victim was taken to the hospital and placed on life

7  support in an attempt to save the life of the fetus,

8  but she was finally taken off life support after

9  doctors determined the fetus was not viable.

10     This offense was carried out moreover in a manner

11  demonstrating callous disregard for human suffering,

12  indeed for public safety, and this inmate had a clear

13  opportunity to cease at any point in which he was both

14  calling and/or going to the victim's home.  He could

15  have ceased, but he continued; and he not only

16  continued, but he carried a loaded weapon with him to

17  the scene.

18     A witness had seen the inmate approximately three

19  weeks before the murder, and the inmate had asked about

20  the victim and then stated, "Revenge is sweet."  And

21  this panel finds that indeed the motive for this killing

22  was very trivial in relation to the offense, and it was

23  revenge.  Initially, the inmate denied the shooting and

24  gave an alibi.  Today, this panel finds that this

25  **AUBREY LOVE    H-26500    DECISION PAGE 6    11/08/07**

1   inmate is not fully credible.  This inmate has shown
2   some attitude of arrogance during this hearing indeed.
3   And it is not credible to this panel that with an
4   active restraining order against the inmate, he
5   incredibly claims that he forgot it existed, although
6   he was very lucid on the night of this crime.

7        Sir, this panel finds that you are regressing.
8   You're justifying your behavior erroneously and
9   minimizing the seriousness of your actions; both with
10  your criminal history when you smiled recalling one of
11  the crimes, to the commitment offense where you told
12  the psychologist, and I'm referring back to Dr.
13  Starrett's, that's S-T-A-R-R-E-T-T, report which was
14  submitted November 5th of 2007.  And I quote Dr.
15  Starrett,

16        "When asking the inmate why this crime
17       occurred, the inmate states he was carrying the
18       gun, but that the shooting was not intentional.
19       Mr. Love states he had the weapon because he was
20       living in the area of the ghetto that was drug-
21       infested, and he was carrying it for
22       protection."
23       The panel finds it showed complete irresponsibility
24  that this inmate, given his criminal history, was
25  **AUBREY LOVE    H-26500    DECISION PAGE 7    11/08/07**

1   carrying an illegal weapon and claiming it was for

2   protection.  I continue with the doctor's report,

3           "The inmate states he shot the victim out

4       of anger.  He offered that he had been drinking,

5       and he was pushed down the stairs, and he shot

6       back to scare the victim.  The inmate states

7       that he loved her."

8       Now if he shot to scare the victim, and he loved

9   her, it is only reasonable, a reasonable person would

10  think that one would then say, oh my god, I shot her

11  and rush to her aid.  That didn't happen.  He left.  So

12  sir, your story falls apart.  Even these many years

13  later, you're still expecting this panel to believe

14  that it was an unlucky shot.  And then you said in this

15  hearing, "I made terrible mistake".  Sir, this panel

16  doesn't feel this was a mistake, and it's offensive

17  that you characterize it that way.

18      And sir there are serious issues here, and I'll

19  refer back to the doctor's report, that concern this

20  panel also.  The doctor writes,

21          "The inmate clearly had attitudes and

22      behaviors that reflect a behavioral pattern

23      associated with domestic violence."

24      And sir you've minimized that domestic violence

25  **AUBREY LOVE    H-26500   DECISION PAGE 8    11/08/07**

116

1  today, and that's of great concern, because your

2  attitude toward women cannot be tested in the

3  institutional setting.  You're living with men.  There

4  may be a few women corrections officers, but I know how

5  few they are.  And you're limited in your interaction

6  with them, and they are, after all, in control of you.

7  So when we talk to you, we see patterns of negative to

8  criminal behavior that you continue to this day to

9  downplay.  That's alarming, and it should be alarming

10  to you sir.

11      Because you talked about, in terms of previously

12  harassing the victim, you said, well, first of all in

13  referring to your children, you said oh, I whup all my

14  children.  You whup them.  It's not clear that whupping

15  your children is acceptable behavior in a civilized

16  society sir.  And then you said well you popped your

17  wife.  And when asked very explicitly by the district

18  attorney, what does that mean, you said well, I slapped

19  her.  Well, sir, in a civilized society probably

20  slapping your wife is not acceptable.  You had domestic

21  violence in your history.  You minimize that. You spoke

22  as if today it's still okay.  And that's alarming.

23  Noteworthy, and I'm quoting the clinician again.  He

24  says is that,

25  **AUBREY LOVE    H-26500   DECISION PAGE 9     11/08/07**

1              "There was an active restraining order

2         against the inmate by the victim, and thus there

3         appears to be some potential relationship

4         problems for him; typically with power and

5         control issues.  The inmate does readily admit

6         that he and his wife used to argue, and if she

7         slapped him, he would slap her back.  He also

8         minimized it, in that he said he never hit a

9         woman with closed fists."

10       Sir, as if that makes it okay.  Well, I just

11  slapped her with an open hand.  I didn't hit her with

12  closed fists.  This is very troubling to this panel

13  sir.  And it's troubling particularly because the

14  clinician goes on to say,

15            "At the current time it cannot be

16         recommended that the inmate be in intensive

17         therapy, because such is not available within

18         the system."

19       That's very troubling.  So, therefore, this panel

20  feels it's very important sir that you find other ways

21  to deal with some of these issues that it's apparent

22  you still have.  And you might be able to work with

23  these in terms of reading and doing self-study.

24  Certainly you should be taking victims' groups that

25  **AUBREY LOVE    H-26500   DECISION PAGE 10    11/08/07**



1  deal with victims' issues.  We think that would be very

2  important to you as well.  But you do have a long way

3  to travel sir to be ready, truly ready to go back out

4  into society where, you're not that old sir.

5       You're only 52 years old, and you could easily have

6  another interaction with another woman.  And that's the

7  fear.  That, in fact, you would become involved with

8  another woman.  You would become jealous or irate or

9  angry, and you'd take it out on her.  That's the issue,

10  and in denying you parole for three years, we're

11  placing you on the 2010 calendar for your next

12  subsequent hearing.

13       The board recommends that you get self-help of the

14  kind I was talking about and all the self-help classes

15  that can be available to you.  Stay discipline-free and

16  earn positive chronos.  And Commissioner Harmon, do you

17  have anything to add?

18       **DEPUTY COMMISSIONER HARMON:**  I think the only thing

19  I can add at this point is I encourage you to pursue

20  maybe self-study in the areas that were recognized as a

21  concern of the doctor and the panel in future

22  relationships with women.  And that could be through

23  readings that may be available through the library or

24  through correspondence.  And another thought, you know

25  **AUBREY LOVE    H-26500   DECISION PAGE 11    11/08/07**

1  there's a lot of major women's centers in all counties,

2  and I'm sure including Alameda.

3      You might wanna consider writing them and asking

4  them to send you materials that may help you get a

5  better understanding of what those problems are and

6  possibly ways of, you know, modifying your behavior.

7  Those are just suggestions, but a little research may

8  allow you to get into that arena.  So with that, I wish

9  you luck sir.

10  **INMATE LOVE:**  Thank you.

11  **PRESIDING COMMISSIONER BRYSON:**  Good luck sir.

12  That concludes this hearing.  The time is now 11:57.

13

14                    **HEARING ENDS**

15                 (Recording ends)

16                    --o0o--

17

18

19

20

21  **PAROLE DENIED FOR THREE YEARS**

22  **THIS DECISION WILL BE FINAL ON:  MAR 0.7 2008**

23  **YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT DATE,**

24  **THE DECISION IS MODIFIED.**

25  **AUBREY LOVE        H-26500      DECISION PAGE 12    11/08/07**

*WPU, Inc.*

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, P.D. Jones, as the Official Transcriber,

hereby certify that the attached proceedings:

In the matter of the Life      )      CDC Number:  H-26500
Term Parole Consideration      )
Hearing of:                    )
                               )
AUBREY LOVE                    )
_____)

CALIFORNIA STATE PRISON - SOLANO

VACAVILLE, CALIFORNIA

NOVEMBER 8, 2007

8:49 A.M.

Were held as herein appears.  Further, this transcript

is a true, complete and accurate record, to the best of

my ability, of the recorded material provided for

transcription.


_____

P.D. JONES
November 27, 2007
WPU, Inc.

# EXHIBIT C

*Barclays Official*

# CALIFORNIA CODE OF REGULATIONS

# Title 15.    Crime Prevention and Corrections

### Division 2.    Board of Prison Terms



THOMSON

WEST

BARCLAYS OFFICIAL CALIFORNIA CODE OF REGULATIONS
50 California Street • Nineteenth Floor • San Francisco, CA 94111
800–888–3600

# § 2402.   Determination of Suitability.

(d) Circumstances Tending to Show Suitability. The following circumstances each tend to show that the prisoner is suitable for release. The circumstances are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel. Circumstances tending to indicate suitability include:

(1) No Juvenile Record. The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.

(2) Stable Social History. The prisoner has experienced reasonably stable relationships with others.

(3) Signs of Remorse. The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense.

(4) Motivation for Crime. The prisoner committed his crime as the result of significant stress in his life, especially if the stress has built over a long period of time.

(5) Battered Woman Syndrome. At the time of the commission of the crime, the prisoner suffered from Battered Woman Syndrome, as defined in section 2000(b), and it appears the criminal behavior was the result of that victimization.

(6) Lack of Criminal History. The prisoner lacks any significant history of violent crime.

(7) Age. The prisoner's present age reduces the probability of recidivism.

(8) Understanding and Plans for Future. The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.

(9) Institutional Behavior. Institutional activities indicate an enhanced ability to function within the law upon release.

NOTE: Authority cited: Sections 3041 and 5076.2, Penal Code. Reference: Sections 3041 and 4801, Penal Code.

### HISTORY

1. New subsection (d)(5), subsection renumbering, and amendment of NOTE filed 3–16–2001 as an emergency; operative 3–16–2001 (Register 2001, No. 11). A Certificate of Compliance must be transmitted to OAL by 7–16–2001 or emergency language will be repealed by operation of law on the following day.
2. Certificate of Compliance as to 3–16–2001 order transmitted to OAL 7–16–2001 and filed 8–20–2001 (Register 2001, No. 34).

# EXHIBIT D

Curtis L. Guinn
3825 Victor Avenue
Oakland, CA 94619
(510) 482-3335

June 6, 2006

*I/m Love H26500*

To whom it may concern:

My name is Curtis Guinn, cousin to Aubrey Love. This letter is written as a character reference on behalf of Mr. Love. I have known Aubrey since early childhood. Aubrey comes from a stable and law abiding family. I am an active member who attend church services regular, and a active participant in Bible studies, Sunday school, Christian Doctrine and serve on the Board of Trustees. I am a Home Owner and a Business man in Alameda County.

I have maintain contact with Aubrey through his incarceration. As a young adult Aubrey, became consumed and caught up in Street life despite the opposition, and advice given to him by family members. I mention the above to share with you the cousin I knew then and the one, I know now has made a positive change. He has admitted that lifestyle was conducive to him committing the crime that he did. He has expressed many times how remorseful he is for his action. I truly believe that Aubrey, is remorseful, that he would not commit any unlawful acts again. That he would be a useful law abiding citizen in the community.

It is my belief that he has gain some attributes while incarcerated, that can be of a good service to the community. It is also my belief that Aubrey has been saved by the Lord Jesus Christ, and that his sins are forgiven. I believe in the scripture Proverbs 22:6. Train up a child in the way he should go and when he is old, he will not depart from it. Aubrey was certainly raised in a Christian home and environment. Yes he did depart from his teaching , however I believe that he has returned to his faith an trust in the Lord and Savor Jesus Christ.

It is obvious to me from his communications through his letters he is a changed person, and that he has repented of his sins and has been forgiven. He has demonstrated through his constructive letter writing his language and focus is much improved. The fact that he has utilized the various trainings, work programs that were available to him through the Department of Correction. He gained knowledge and skills in areas of Janitorial, Painting and Refrigeration/Air conditioning. I was grateful to hear that Aubrey had chosen areas of my expertise. I supervised and managed these particular trades in my previous employment, with the State of California, Department of General Services, office of Building and Grounds Division for 30 + years.


INMATE COPY

My present position at this time allows me the opportunity to offer/provide a place for Aubrey to live.

With the current skills he has obtained in, Janitorial and Painting he will be useful working with me, in maintaining my rental properties.

In summary it is my belief that Aubrey has made a positive change in his lifestyle. With continued support and assistance from his family, Aubrey can make a contribution to the family and community.

Respectfully

*Curtis L. Gwinn*

INMATE COPY

# EXHIBIT E



# Certificate of Proficiency

*Aubrey Love*

Proudly made in California
www.pia.ca.gov

Industry: **Metal Products**

**Job Title/Specialty**

Painter, Spray I

**D.O.T. No.**
741.684.026

\* US Department of Labor, Dictionary of Occupational Titles

Institution: **CSP-Solano**
CDC#: **H-26500**

**No. of Hours**
1,500 +

Scott Beser
Supervisor                    07-24-07
                              Date

Charles Pickett
General Manager, Prison Industry Authority

# Certificate of Achievement

Awarded to:

*Aubrey Love*

for satisfactory completion of the Janitorial Floor Equipment
On the Job Training Class, Folsom State Prison

January 21, 1999

_____
Song Lim
Voc. Ed. Janitorial Instructor

_____
Michael Jean
Maintex, Inc. - Trainer

STATE OF CALIFORNIA
CDC 163-B (11/92)

DEPARTMENT OF CORRECTIONS

*Vocational Education*

CERTIFICATE OF COMPLETION

THIS IS TO CERTIFY THAT

AUBREY J. HOLT

HAS SUCCESSFULLY COMPLETED THE

VOCATIONAL REFRIGERATION TRAINING PROGRAM

SUPERVISOR OF VOCATIONAL INSTRUCTION

LOG # 24 26 58 H 26500

VOCATIONAL INSTRUCTOR

JUNE 26, 1998

DATE



STATE OF CALIFORNIA
CDC 183-C (11/92)

DEPARTMENT OF CORRECTIONS

*Vocational Education*

COMPLETION OR CERTIFICATION UNIT

THIS IS TO CERTIFY THAT

AUBREY L. LOVE

HAS SUCCESSFULLY COMPLETED THE
CERTIFICATION UNIT OF

V03.05.22.012 REFRIGERANTS/RECOVERY (RECLAMATION)

VOCATIONAL REFRIGERATION PROGRAM

SUPERVISOR OF VOCATIONAL INSTRUCTION

VOCATIONAL INSTRUCTOR

LOG# 2430 2H26500

AUG. 5, 1998
DATE

# EXHIBIT F



**PSYCHOLOGICAL EVALUATION**
**FOR THE BOARD OF PAROLE HEARINGS**
**NOVEMBER 2007 SUBSEQUENT CALENDAR**
**FORENSIC ASSESSMENT DIVISION**
**CALIFORNIA STATE PRISON - SOLANO**

## I. IDENTIFYING INFORMATION

| | |
|---|---|
| Inmate Name: | Love, Aubrey |
| CDC Number: | H-26500 |
| DOB (*Current Age*): | 01-27-1956   (*currently 52 years old*) |
| Controlling Offense: | Murder Second with Use of Weapon |
| Date of Offenses (*Age at time*): | 05-08-1990   (*then age 33*) |
| Sentence: | 18 years to Life |
| County of Commitment: | Alameda County |
| Date Entered into CDCR: | 03-02-1992 |
| Date Received at Solano: | 05-22-2002 |
| Placement Score: | 19 |
| CDCR Forensic Evaluator: | Richard Starrett, Ph.D., Ph.D. |
| Date of Evaluation: | 10-25-2007 |

## II. SOURCES OF INFORMATION

The inmate's Central File (C-File) and Unit Health Record (UHR) were reviewed. He was interviewed for the purpose of the current evaluation on October 25, 2007. He was informed that the interview was not confidential and that a report with the results of the evaluation would be submitted to the Board of Parole Hearings (BPH) to assist in determining his suitability for parole. The inmate appeared to understand the nature and purpose of the evaluation, and the possible consequences of the interview to the best of the inmate's ability. Unless otherwise indicated, the inmate agreed to participate in the interview. For reasons not limited to the possibility that an individual may have a mental disability or condition, which may qualify under the Americans with Disabilities Act, the evaluation was conducted by a licensed psychologist. Also, it is the conclusion of the undersigned examiner that it was not necessary to provide auxiliary aids or assistance to achieve effective communication. This evaluator is not responsible for any inaccurate statements, or subsequently changed opinions, expressed by the inmate.

This current report is an addendum for update to the BPH, and only information relevant to the current assessment, and more recent to prior reports, will be addressed. The Mental Health report from 2004 should be consulted for any questions or concerns regarding background information unless clarified otherwise below.

INMATE COPY

## III.  QUESTIONS POSED BY MOST RECENT BPH

After the inmate's 2006 BPH hearing, the panel subsequently submitted BPH Form 1000(a) requesting an updated psychological assessment of the inmate to include:
 1) The prisoner's violence potential in the free community;
 2) The issue of domestic violence.

## IV.   INTERVIEW INFORMATION

At the outset of the interview for the purpose of this report to the Board of Parole Hearings, the planned focus was to update any information relative to the most recent full evaluation, as well as to deal with any unexamined issues relative to intrapersonal functioning at the time of the index offense.

Mr. Love is a 52-year-old divorced African American male who is monotheistic. The inmate was oriented to person, place and time. He was alert and cooperative. His simple registration was intact. There was impairment in short-term memory, as he could only remember one of three words across time. His simple abstract thinking and mathematical ability were intact. His complex problem solving was weak. He did not appear to understand proverbs.

At the current time, he denies any problems with depression, anxiety, mood swings or symptoms of a mood disorder. He denies any auditory or visual hallucinations and evidenced no delusional or paranoid thinking. He denies any eating or sleeping problems. He denies any mental health problems as a child. He denies any suicidal or homicidal thinking.

INSTITUTIONAL PROGRAMMING:  The inmate was received into CDCR on March 2, 1992, and has served approximately 15 years of a Life sentence. His placement score as of March 6, 2007 was 19, or decreased from 47 in 1995. The inmate has never received any CDC-115s nor has he received any CDC-128A Counseling Chronos.

Mr. Love received his GED in the community. He has no educational upgrades while incarcerated. The inmate has developed vocations in janitorial and air conditioning and refrigeration, and has currently been working in PIA metal fabrication, Cal Trans and welding. The inmate has also worked as a porter and doing painting. His work performance ratings are reported to be satisfactory to above average. The inmate has been involved in AA for about 12 years. Since his last appearance before the Board, the inmate was in a relationship awareness class. He has prior self-help group involvements. The inmate is active in his church and bible study. He had a triple by-pass surgery in the past, and is being medically treated for heart problems. He is not in the mental health system (MHSDS). His mother passed away since his last Board appearance.

**INMATE COPY**

INSIGHT / SELF ASSESSMENT: The inmate states his personal strengths are his personality, honest, and loyal. He opined that the area on which he continues to work is communicating with people, spiritual growth, and staying clean and sober. His biggest accomplishment is reported as being clean and sober, facing his weaknesses, dealing with pain and managing stress. The inmate states that his biggest change over the years is coming to grips with himself and having no desire to drink. In addition, he listens more.

PAROLE PLANS IF GRANTED A RELEASE: The inmate's plans to parole to live with his mother in Alameda, where he reportedly has a job offer. He has looked into AA programs in the community. His parole plans seem feasible and appropriate, if verified.

INMATE UNDERSTANDING OF LIFE CRIME: The inmate was charged with PC §187, Murder Second Degree with a Weapons Enhancement, PC §12022.5. According to the CC-I report of April, 2007:

Summary of the Crime: On May 8, 1990, the Police were called to the victim's (Patricia Churchill) house. When the Police arrived, Patricia Churchill was bleeding from the back of her head from a gunshot wound. None of the neighbors heard anything, but they all identified Aubrey Love (prisoner) as the victim's husband. Witnesses reported the victim and Love fought often. When the victim was taken to the hospital it was determined she was sixteen to twenty weeks pregnant. The victim was placed on life support in an attempt to save the life of the fetus. Patricia Churchill (victim) was finally taken off life support after it was determined the fetus was not viable.

During the investigation it was discovered that on November 11, 1989, the victim filed a domestic dispute against Love. One witness stated it was filed after cousins of the victim beat Love. Another witness stated the victim informed her that the victim was planning to leave Love and did not want him to know. This same witness had seen Love approximately three weeks before the murder and Love had asked about the victim. He stated "Revenge is sweet." The witness also stated she heard sounds of fighting earlier in the evening of the victim's death.

When Love was first interviewed he admitted living with the victim on a sporadic basis after meeting her at Herzog, an inpatient drug rehabilitation program. He admitted he had a .32 caliber handgun, but it was only an antique handgun. He claimed he was home all day on the day of the shooting and was not drinking. He also claimed he did not know the victim was pregnant. He reported his relation with her ended when he had an argument with the victim, and when her cousins had beaten him. He claims he assured the victim he would not press charges against her or her cousin's inspire of the fact that he was hospitalized.

During another interview with Love, a request was made for the truth. Love's response was: "Request for the truth. Ok I'll confess. She told me to come over and get the rest of my stuff. I called her about 9:00 p.m., she asked me to come and get the rest of my things, and I asked, "Is this another game?" She said "No just come over and get the rest of your shit." I took my .32, I went up the back steps. The door was open; she threw my shirt and underwear at me. She spit at me and tried to kick me. I fired once or twice and then left. I slipped down the stairs. I got up and started walking and she was still hollering. I had been drinking quite a bit that day. I went by bus to her house and went back to my house by bus. I threw two shells away and put two live shells in the gun.

INMATE COPY

*Source documents is the Probation Officer's Report (POR) typed February 13, 1992, pages 1 through 14.*

Prisoner's Version: Love was interviewed on June 18, 2001. Love provided this statement: On May 8, 1990, about 9:30 or 10:00 P.M. I was asked by Pat over the phone to come and get the remaining things that she forgot to give me earlier. As we talked I asked her if there would be any problems. Her answer was "no." I must admit I had been drinking a bit and I truly forgot about the restraining order when I went to her apartment. During the time we lived together I would carry a gun at times. The night of the incident I was not carrying it to do harm to Patricia because I cared for her even though we were no longer together. As I came up the stairs and got to the top of the stairs, the door came open. She came out talking crazy; she threw a few clothes and other items at me. We got into a verbal argument. As I was going back down the stairs, I was pushed and I stumbled down the stairs. Out of anger I shot up at the door not knowing that she was peeping out of the door and she was hit in the forehead with the bullet. When the police picked me up in Berkeley two days later, they took me to the Oakland Police Department for questioning. At the beginning of the questioning, I started lying because I didn't believe Patricia was injured. As the interview continued I realized she had been killed and she was also pregnant. The whole situation made me very sad and it all seemed like a dream. In all honesty this incident was an unintentional accidental shooting. But because of my mistakes, a person is dead as well as my child. I am truly sorry for the victim, her family and my child.

During an interview with Love on April 13, 2007, he stated his version remains the same.

The inmate has no juvenile arrests. He stated that he began getting into trouble around the age of 18 or 19. He has multiple misdemeanor arrests beginning in 1975, including 16 different charges, the most serious of which are Battery-related charges. He has no domestic violence charges; however, he did have a restraining order against him at the time of the offense. The inmate states the reason why he was getting into trouble back then was due to his drinking, the people he was associating with, and trying to be cool to impress people.

The inmate was given the opportunity to read the 2007 version of his account. He offered no augmentations, clarifications or corrections. The inmate was 33 to 34 years at the time of the crime. He was married, and working off and on at several different jobs. He was drinking and was associating with some criminal types.

When asking the inmate why this crime occurred, the inmate states he was carrying the gun, but that the shooting was not intentional. Mr. Love states he had the weapon because he was living in the area in the ghetto that was drug-infested and he was carrying it for protection. The inmate states he shot the victim out of anger. He offered that he had been drinking, and he was pushed down the stairs, and he shot back to scare the victim. The inmate states he "loved her" (victim). He said they had recently broken up and that the relationship had been something that was in the past. He was getting some of his clothes back. He surmised that the problem with their relationship was that he relapsed into drinking, and she relapsed into using cocaine. They had met in an alcohol and drug treatment program.

When asking the inmate why violence was used in this crime, the inmate states they exchanged words. He was pushed, stumbled, and fell down the stairs. He shot the handgun

INMATE COPY

up the stairs to scare her. The inmate states there is no excuse for his behavior. He accepts responsibility and he is sorry.

When asking the inmate about his feelings regarding the loss of life and the effect on the victim's family, the inmate states he is sorry and sad. He asked God for forgiveness. He said it is a tremendous loss to the victim's family, her son and her acquaintances. He said it is something that he will never forget.

When asking the inmate about how one makes restitution for something like this, the inmate said, "You can ask God to forgive you. If there's anything I could do for the family to help them, I would. I'll try to help in the community. I want to be an AA facilitator."

When asking the inmate what has changed about him so that something like this would not happen again, the inmate states he has changed the friends with whom he associates. His mind frame has changed, and he is no longer using alcohol and drugs. He is not into material things anymore. He is more positive in himself and aligns himself with positive people. He is more pro-socially productive now. He goes to church and does his AA programs.

MENTAL HEALTH CONCERNS OR PERSONALITY DISORDERS: The inmate has no current mental health problems. He would meet the diagnostic criteria for Alcohol Dependence, in controlled environment remission. The inmate started using alcohol in his late teens, evolving into multiple arrests and problems in the community, and culminating in his controlling case. The inmate would also meet the diagnostic criteria for Adult Antisocial Behavior. The inmate has multiple arrests as a young adult culminating in the controlling case.

## V.  DIAGNOSTIC IMPRESSION

| Axis I: | 303.90 | Alcohol Dependence, in controlled environment remission |
| | V71.01 | Adult Antisocial Behavior |
| Axis II: | V71.09 | No Diagnosis on Axis II |
| Axis III: | | S/P Cardiac surgery, and history of heart and seizure disorder |
| Axis IV: | | Incarceration for life term |
| Axis V: | | GAF: 90 |

## VI.  PREVIOUS EVALUATION SUMMARIES

A Psychological Evaluation dated December 6, 2004 diagnosed the inmate with Alcohol Dependence, in remission. The author believed that the inmate appears to show a moderate risk of dangerousness if released to the public.

A Psychosocial Assessment dated March 20, 2001 diagnosed the inmate with Alcohol Abuse, in remission. The author thought that the inmate does not pose more than a "normal" risk factor, in or out of a controlled environment.

INMATE COPY

A Psychological Evaluation dated March 2, 1995 diagnosed the inmate with Alcohol Dependence, Opiate Dependence, Antisocial Personality Disorder, and Seizure Disorder. His violence potential is considered average when compared to other inmates.

## VII.  VIOLENCE RISK ASSESSMENT/CONCLUSIONS

The Board of Parole Hearings' questions will be addressed for each issue presented, as noted in an earlier section of this report.

### 1) *The prisoner's violence potential in the free community;*

The current research literature indicates that an empirically based approach to is the most reliable and valid method for assessing risk of future violence. In the present evaluation, two separate assessment guides were used to help estimate this individual's risk for future violence in the community: the Psychopathy Check List Revised (PCL-R) and the History - Clinical - Risk Management - 20 (HCR-20). The LS/CMI (Level of Service/Case Management Inventory) was utilized as an objective, actuarial assessment of the inmate's risk for general recidivism. The data for scoring these instruments were obtained from information derived in both the inmate interview and the files reviewed. These measures are widely used and are supported by years of research in the risk assessment field. They have been cross validated with various forensic populations, including United States males in correctional settings; however, the following results need to be regarded with some level of caution since some individuals may possess idiographic differences that could limit the applicability of these instruments. The evaluator has taken these factors into consideration in determining how much weight to allot each of the measures and in formulating an overall estimate of risk for future violence in the community. Estimates of risk for violence will be presented categorically: low, moderate, or high.

PCL-R: The PCL-R was scored to assess the inmate's level of psychopathy, a trait that has been linked to episodes of repetitive aggression and criminality. Information used in this assessment includes data from the inmate's records and his verbalizations in the current interview. The inmate scored in the low range of psychopathy, or at the 14th percentile relative to the population of incarcerated males in the norming group. His personality traits (Factor 1) are at the 2nd percentile, and his past antisocial behaviors (Factor 2) are at the 51st percentile.

HCR-20: The HCR-20 was scored, based on data in the inmate's records and information obtained in the current interview, to assess for level of risk for future violence.

Historical: Historical factors rate the inmate in the moderate range in propensity for future violence. This rating is based on his age at the time of his first violence, past arrest history, being involved in unstable relationships, being a substance abuser, being on prior supervision and, to a lesser extent, not establishing a career.

INMATE COPY

Clinical/Insight: The inmate would rate in the <u>low</u> range in his propensity for future violence in this factor. The inmate does not have a negative attitude. He does not have active mental health symptoms and he is not impulsive. The inmate has had a good response to treatment. His insight seems appropriate to his cognitive functioning.

Risk Management: The inmate would rate in the <u>low</u> range in the risk management factor. The inmate has been able to handle compliance, stress and destabilizers well while incarcerated. The inmate's parole plans seem feasible, if verified.

The inmates overall propensity for violence is in the **low** on the factors involved in this particular instrument.

LS/CMI: This instrument was scored, based on data from the inmate's records and information obtained in the current interview, for level of future risk for general recidivism, and not violence per se. The inmate's general recidivism risk is rated in the **low** range.

OVERALL RISK ASSESSMENT: The inmate's level of psychopathy is in the *low* range. The inmates overall propensity for violence is in the *low* range compared to similar inmates. The inmate's general recidivism risk is rated in the *low* range.

### 2). *The issue of domestic violence.*

The inmate clearly had attitudes and behaviors that reflect a behavioral pattern associated with domestic violence. The inmate, however, has no arrests in this area and he was never referred to a domestic violence treatment program. Noteworthy, however, is that there reportedly was an active restraining order against the inmate by the victim, and thus there appears to be some potential relationship problems for him, typically with power and control issues. The inmate does readily admit that he and his wife use to argue and, if she slapped him, he would slap her back. He minimized, however, that he never hit a woman with closed fists. He explained that one of the reasons for this was that his parents physically fought "a lot," and he saw what his mother went through, and did not want to see anyone else go through this. The inmate realizes that his self-help needs include focusing on relationships, anger management, victim's awareness, and women's issues regarding relationships. He states that he realizes that he had a lot of attitudes and behaviors that were wrong in the past, and is aware that "everybody was hurt" as a consequence of his actions. The inmate has tried to take remediative actions in the above areas. At the current time, it cannot be recommended that the inmate be in any intensive therapy or relationship counseling to deal with these issues, primarily because such is not available within the system. Additionally, this individual is in the general population and does not qualify for inclusion in the mental health treatment population, and thus access to formal psychotherapeutic involvements.

INMATE COPY

*[signature]* Dr. A Starrett

11-5-2007
Date Submitted

Richard Starrett, Ph.D.,Ph.D., CA License # PSY-13628
Contract Forensic Psychologist
Board of Parole Hearings / Forensic Assessment Division
California Department of Corrections and Rehabilitation

*[signature]*

Reviewed by:

Steven Walker, PhD; CA License #PSY-11894
Senior Psychologist, Supervisor

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use, or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act and the Health Insurance Portability and Accountability Act (HIPAA). If you are not the intended recipient, please contact the sender and destroy all copies of this communication.

**INMATE COPY**

# EXHIBIT G

This inmate has successfully completed the five (5) session Managing Anger Seminar, a program founded upon the associated principles outlined in the Self-Care Management Curriculum. This provided each participant the ability to understand and discuss his culpability, trival, grave, thoughts or feelings that enabled him to engage in behavior that eventually led to his current incarceration. The member is encouraged to explore personal experiences while incarcerated that has led to his change in behavior and thinking. This inmate is to be commended for being involved in this volunteer program.

EDDIE MUÑOZ, Sponsor
Managing Anger Program
CSP-Solano

Original: C-File
Copies: Writer/Inmate

DATE        November 22, 2007        (LAUDATORY)        GENERAL CHRONO

---

NAME and NUMBER        LOVE        H-26500        15-B-2L        (B)        CDC-128-B (Rev. 4/74)

Inmate Love on this day has successfully completed the Relationship Awareness Workshop. This workshop discussed the following topics: Extra Baggage, Required Relationship Principles, Dysfunctional Relationship Behavior, Taking Responsibility for Your Own Actions, Pre-Marital Reflections. This provided the inmates with positive alternatives through a thorough comprehension of response techniques to productive lifestyle choices, and insight into how unhealthy relationships effected their lives.

This Relationship workshop is a voluntary group comprised of five (5) weekly sessions, building a personal relationship management plan of necessary fundamental foundation principles.

MIKE Brewer, Sponsor,
Relationship Awareness Workshop
CSP-Solano

Original: Central File
Copies: Writer/Inmate

DATE        November 20, 2005        (LAUDATORY)        GENERAL CHRONO

---

NAME and NUMBER        LOVE        H-26500        15-B-2L        (B)        CDC-128-B (Rev. 4/74)

Inmate Love, H-26500 has successfully completed the Stress Management Program, which entails extensive participation and group discussions in association with physical, emotional and behavioral symptoms of stress. This seminar also provides a thorough comprehension of response techniques, positive self-talk messages, time management tips, relaxation exercises and a "Commitment to Change Plan" to ensure lifestyle choices for the future and to be able to handle stress in a non destructive manner.

The Stress Management Program is a voluntary group comprised of five (5) weekly sessions, each building upon the fundamental principles necessary for the development of a personal plan.

MIKE BREWER, Sponsor
Stress Management Program
CSP-Solano

Original: Central File
Copies: Writer/Inmate

DATE        July 20, 2005        (LAUDATORY)        GENERAL CHRONO

CDC – 128-B   **AA**

Name:   **LOVE**                    CDC#:   **H-26500**   Housing: FACILITY 3

RE:       **PARTICIPATION IN SIGNIFICANT SELF-HELP PROGRAM**   15 - B - 2L

The above named inmate is participating in the ALCOHOLICS/NARCOTICS ANONYMOUS Program, and has attended regularly scheduled meetings during the past (3) months. During his attendance he has been an active participant and has shown an honest desire to help himself through his self-help program.

QTR
1ST Jan – Mar   2007      *DELIVERED DEC 1 3 2007*
2nd Apr – Jun
3rd Jul – Sep
4th Oct – Dec

R.J. BEASON – SPONSOR (X- 3233)
Alcoholics/Narcotics Anonymous
Facility I, II, III, IV
California State Prison Solano

**GENERAL CHRONO**

---

CDC – 128-B   **AA**                                                         State of California

Name:   **LOVE**                    CDC#:   **H-26500**      Housing:  FACILITY 3

RE:       **PARTICIPATION IN SIGNIFICANT SELF-HELP PROGRAM**

The above named inmate is participating in the ALCOHOLICS/NARCOTICS ANONYMOUS Program, and has attended regularly scheduled meetings during the past (3) months. During his attendance he has been an active participant and has shown an honest desire to help himself through his self-help program.

QTR
1ST Jan – Mar   2007
2nd Apr – Jun
3rd Jul – Sep
4th Oct – Dec

R.J. BEASON– SPONSOR (X- 3233)
Alcoholics/Narcotics Anonymous
Facility I, II, III, IV
California State Prison Solano

**GENERAL CHRONO**

Name:    **LOVE**                              CDC#:  **H-26500**      Housing: FACILITY 3

RE:      **PARTICIPATION IN SIGNIFICANT SELF-HELP PROGRAM**

The above named inmate is participating in the ALCOHOLICS/███████ ANONYMOUS Program, and has attended
regularly scheduled meetings during the past (3) months.  During his attendance he has been an active participant and
has shown an honest desire to help himself through his self-help program.

QTR
1ST Jan – Mar
2nd Apr – Jun     **2006**
3rd Jul – Sep
4th Oct – Dec

E.R. MUNOZ– SPONSOR (X- 5561)
Alcoholics/Narcotics Anonymous
Facility I, II, III, IV
California State Prison Solano

**GENERAL CHRONO**

CDC – 128-B   **AA**                                                              State of California

Name:    **LOVE**                              CDC#:  **H-26500**      Housing:  FACILITY 3

RE:      **PARTICIPATION IN SIGNIFICANT SELF-HELP PROGRAM**

The above named inmate is participating in the ALCOHOLICS/NARCOTICS ANONYMOUS Program, and has attended
regularly scheduled meetings during the past (3) months.  During his attendance he has been an active participant and
has shown an honest desire to help himself through his self-help program.

QTR
1ST Jan – Mar
2nd Apr – Jun     **2006**
3rd Jul – Sep
4th Oct – Dec

E.R. MUNOZ– SPONSOR (X- 5561)
Alcoholics/Narcotics Anonymous
Facility I, II, III, IV
California State Prison Solano

**GENERAL CHRONO**

NAME/CDC# LOVE    H 26500         HOUSING:

## RE: PARTICIPATION IN SIGNIFICANT SELF-HELP PROGRAM

The above named inmate is participating in the Alcoholics Anonymous Program, and has attended regularly scheduled meetings during the past (3) months. During his attendance he has been an active participant and has shown an honest desire to help himself through this self-help program.

QTR

1ST JAN-MAR

2ND APR-JUN    2005

3RD JUL-SEP

4TH OCT-DEC

EDDIE MUNOZ - SPONSOR X5561
Alcoholics/Narcotics Anonymous
Facility I, II, III, IV
California State Prison Solano

**GENERAL CHRONO**

CDC-128-B (Rev. 4/74)

---

CDC-128-B (Rev. 4/74)

NAME/CDC# H 26500    LOVE         HOUSING: FAC 3

## RE: PARTICIPATION IN SIGNIFICANT SELF-HELP PROGRAM

The above named inmate is participating in the Alcoholics Anonymous Program, and has attended regularly scheduled meetings during the past (3) months. During his attendance he has been an active participant and has shown an honest desire to help himself through this self-help program.

QTR

1ST JAN-MAR

2ND APR-JUN    2005

3RD JUL-SEP

4TH OCT-DEC

SPONSOR    EDDIE MUNOZ X5561
Alcoholics/Narcotics Anonymous
Facility I, II, III, IV
California State Prison Solano

**GENERAL CHRONO**



*This is to certify that*

Aubrey L. Love          H26500

has successfully completed a

Substance Abuse Program

at Folsom State Prison.

November 15, 2000

Reverend Thomas Maguire
Chaplain & Instructor



# A. C. T. S.

### Alcohol / Chemical Treatment Series

## Certificate of Participation

*This certifies that*

AUBREY L. LOVE

has completed ___Twelve___ hours of

### Chemical Dependency Training

**Instructor** Chambers

**Date** 12/2/96

• National Headquarters •
8855 Dunn Road • Hazelwood, Missouri 63042-2299

Love, H-26500
CSP-Solano, 15-B-2-L
P.O. Box 4000
Vacaville, CA   95696-4000

PRIORITY MAIL
UNITED STATES POSTAL SERVICE ™
www.usps.gov
LABEL 107R, OCT 1997

CLERK OF THE UNITE
COURT FOR THE NOI
OF CALIFORNIA
450 GOLDEN GATE /
SAN FRANCISCO, C/



**CSP SOLANO
STATE PRISON**

UNITED STATES POSTAGE
$ 04.80
PITNEY BOWES
02 1A
0004632981     AUG 25 2008
MAILED FROM ZIP CODE 95687

CALIFORNIA STATE PRISON SOLANO

ED STATES DISTRICT
RTHERN DISTRICT

VENUE, Box 36060
94102

**LEGAL MAIL**





RECEIVED

AUG 2 6 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

RECYCLED PAPER.
MINIMUM 20% POST-CONSUMER
FIBER CONTENT.
Columbian® — 95 Clasp (10 x 12)